No. 34,307

THE CAROLENE PRODUCTS COMPANY, *Appellant*, v. J. C. MOHLER, Secretary of Agriculture of the State of Kansas, and H. E. DODGE, Dairy Commissioner of the State of Kansas, *Appellees.*

(102 P. 2d 1044)

Opinion filed June 8, 1940.

T. M. Lillard, J. Glenn Logan and Harold E. Doherty, all of Topeka, for the appellant; George N. Murdock, of Chicago, Ill., Boyle G. Clark, of Columbia, Mo., and Howard C. Knotts, of Springfield, Ill., of counsel.

Jay S. Parker, attorney general, C. Glenn Morris, assistant attorney general, and Warden Noe, special assistant attorney general, for the appellees.

The opinion of the court was delivered by

ALLEN, J.: This action was to enjoin the defendants as state officials from enforcing the statute known as the "filled-milk" act. Judgment was for defendants. Plaintiff appeals.

The so-called filled-milk statute, being paragraph 2, subdivision F of G. S. 1935, 65-707, reads:

"It shall be unlawful to manufacture, sell, keep for sale, or have in possession with intent to sell or exchange, any milk, cream, skim milk, buttermilk, condensed or evaporated milk, powdered milk, condensed skim milk, or any of the fluid derivatives of any of them to which has been added any fat or oil other than milk fat, either under the name of said products, or articles or the derivatives thereof, or under any fictitious or trade name whatsoever."

The petition alleges: The business of the plaintiff, a Michigan corporation, is the sale of an article of food sold under the trade names of Carolene and Milnut. It is alleged:

"5. That plaintiff's said product, Carolene, is made by taking sweet skimmed milk and adding thereto approximately six percent (6%) pure coconut oil and vitamin concentrates to an amount so that each 14½-ounce can of the product contains in excess of 2,000 U. S. P. XI units of vitamin A and in excess of 400 U. S. P. XI units of vitamin D, and then evaporating the moisture content from the mixture until approximately twenty percent (20%) skimmed milk solids remain; that Milnut is composed of the same ingredients or constituents, and is manufactured in the same manner.

"6. That the coconut oil used in the manufacture of Carolene and Milnut is a pure, wholesome and nutritious food product, and that neither it nor any combination of it with skimmed milk and vitamins A and D as done by plaintiff, is deleterious to health; that a manufacture of plaintiff's said products is done in a wholly sanitary and healthful manner and that the manufacture, sale, possession and or use thereof is not in any manner harmful or injurious to health or dangerous to the public."

It is alleged that a large number of retail grocers have been selling plaintiff's product; that a large and valuable business in the sale of such product has been established; that the agents and inspectors of defendants assert that the sale and possession of such product

is unlawful and that the law will be enforced; that as a result of such warning and the threat of prosecution plaintiff's customers have canceled orders for such product and have refused to purchase it; that unless the court shall find and declare the sale of such product is lawful, plaintiff will be deprived of its constitutional right to do business in the state and will suffer great and irreparable injury and damage, and that plaintiff has no adequate remedy at law. It is further alleged:

"11. That this plaintiff contends that said act is unconstitutional and void, for the following reasons:

"(a) Because it deprives this plaintiff of its property without due process of law, in violation of the fifth amendment of the constitution of the United States, of section one of the fourteenth amendment to the constitution of the United States, and of paragraph one of the constitution of the state of Kansas.

"(b) Because it denies to the plaintiff the equal protection of the laws of the state in violation of section one (1) of the fourteenth amendment to the constitution of the United States and of the constitution of the state of Kansas in that said act is discriminatory and an arbitrary and unreasonable classification, because the sale in this state of each ingredient contained in Carolene and Milnut, either by itself or in combination with other substances, is permitted while prohibiting the sale of Carolene and Milnut.

"(c) Because the said law is prohibitive and not regulatory and prevents the carrying on of a perfectly legal and beneficial trade and business.

"(d) That said law is a special law in violation of paragraph 17 of the constitution of the state of Kansas.

"(e) Because it is contrary to public policy to so prohibit the sale of a pure, wholesome, sanitary and nutritious article of food.

"(f) Because it is an arbitrary and unreasonable interference with private business, imposes harsh and unreasonable restrictions upon a lawful occupation, and is an abuse of the police power of the state, there being nothing about plaintiff's product that is injurious to the health, safety, morals or welfare of the public.

"(g) Because it is a harsh, arbitrary, unreasonable and unnecessary restraint of trade.

"(h) Because it is class legislation, denying to one class of citizens a right granted to another class, there being no reasonable basis for such classification.

"(i) Because the legislature has no power or authority to make the performance of an innocent act criminal, nor to prohibit the same, when the public health, safety, comfort or welfare is not interfered with or endangered.

"(j) Because the law makes an unjust, unreasonable and arbitrary classification and discrimination between products and business and is therefore class legislation and is unconstitutional and void."

Upon filing of the petition a temporary restraining order was issued. The answer was a general denial.

The court made findings of fact and returned conclusions of law as follows:

"FINDINGS OF FACT.

"1. The plaintiff, The Carolene Products Company, is a corporation organized and existing under the laws of the state of Michigan, whose sole business is the sale of an article of food sold under the trade names of Carolene and Milnut, which products are manufactured for it by the Litchfield Creamery Company, of Litchfield, Ill., and Warsaw, Ind. That said trade names are the property of the plaintiff.

"2. Said products are sold in Kansas by plaintiff through brokers resident of the state of Kansas, who in turn sell them to wholesalers and jobbers, and they are by them sold to retail dealers. Orders for the products are taken by such brokers and sent to the plaintiff company, which in turn ships its products direct to the purchaser, who pays the plaintiff company for such products. Plaintiff company pays such brokers on a commission basis for the products sold by them for the plaintiff company.

"3. Carolene and Milnut are identical in every way except as to the labels under which the product is sold, and the labels are identical with the exception of the words 'Milnut' and 'Carolene.'

"4. That Carolene and Milnut are made by taking fresh, sweet, skimmed milk and adding thereto approximately six percent pure refined cocoanut oil and vitamins A and D concentrates; the mixture being reduced by evaporation until it consists of twenty percent milk solids other than fats, thoroughly sterilized and free from bacteria.

"5. That when the milk is separated to produce skimmed milk and used in plaintiff's product, the cream, which is that portion of the milk rich in butterfat and which is taken off in the separation process, contains substantially all the butterfat, a substantial part of the vitamin G naturally in whole milk, all of the nicotinic acid, and all the grass juice factor.

"6. Evaporated milk is whole milk, from which a part of the water has been removed.

"7. Evaporated whole milk contains 7.8 percent butterfat. Carolene and Milnut contain six percent of fat other than milk fat, that is, coconut oil.

"8. Butterfat, chemically regarded, is an entirely different kind of fat from that of coconut oil. Butterfat is the animal fat which nature develops for all mammals for the suckling of the young. Coconut oil is a vegetable fat.

"9. That there is a serious disagreement among experts on nutrition as to whether coconut oil is a pure, healthful and nutritious food. That the weight of the evidence does not show that coconut oil is a pure, nutritious and healthful food and not harmful when used as food.

"10. Carolene and Milnut are kept and displayed on the shelves and counters of retail stores in Kansas, along with nationally advertised and widely known brands of genuine evaporated whole milk.

"11. Carolene has been advertised and sold by retail grocers as and for genuine evaporated whole milk in the state of Kansas.

"12. Carolene has been purchased as and for genuine evaporated whole milk by the consuming public in the state of Kansas.

"13. Carolene and evaporated whole milk are identical in taste, odor, appearance and consistency, and Carolene is sold in the same sized containers as evaporated milk.

"CONCLUSIONS OF LAW

"1. That subsection 2 of paragraph F of section 65-707 of the General Statutes of Kansas of 1935 is constitutional.

"2. Said statute is a proper exercise of the state's police power.

"3. That an injunction, as prayed for, enjoining the defendants from the enforcement of said section, be denied, and the temporary injunction heretofore issued be and the same is dissolved."

As stated, it is contended the filled-milk statute violates the constitution of the United States and the constitution of the state of Kansas.

Defendants contend the statute was enacted by the legislature in the lawful exercise of the police power; that it is not unreasonable or arbitrary, and that it does not deprive the plaintiff of its property without due process of law.

In the License Cases, 5 How. 504, 12 L. Ed. 256, the police power of a state was defined by Chief Justice Taney:

"But what are the police powers of a state? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a state passes a quarantine law, or a law to punish offenses, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except insofar as it has been restricted by the constitution of the United States. And when the validity of a state law making regulations of commerce is drawn into question in a judicial tribunal, the authority to pass it cannot be made to depend upon the motives that may be supposed to have influenced the legislature, nor can the court inquire whether it was intended to guard the citizens of the state from pestilence and disease, or to make regulations of commerce for the interests and convenience of trade.

"Upon this question the object and motive of the state are of no importance, and cannot influence the decision. It is a question of power. . . ." (p. 583.)

The scope of the police power of the state was discussed in the trading-stamp case, *State v. Wilson*, 101 Kan. 789, 168 Pac. 679. It was there said:

"The assumption that the police power extends only to the protection of the health, safety and morals of the public, which was at one time quite general, is now out of date. The modern view is that the state may control

the conduct of individuals by any regulation which upon reasonable grounds can be regarded as adapted to promoting the common welfare, convenience, or prosperity. (6 R. C. L. 203, 204.)

"On March 6, 1916, two statutes, quite similar to those which had been so generally condemned, were upheld by the federal supreme court in a series of unanimous opinions, on the ground that they were enacted under a proper exercise of the police power, and that the decision of a legislative body that the use of trading stamps is harmful to the public is not subject to judicial review. (*Rast v. Van Deman & Lewis,* 240 U. S. 342; *Tanner v. Little,* 240 U. S. 369; *Pitney v. Washington,* 240 U. S. 387.)

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The question for our determination is not whether in our judgment the objections urged against the trading-stamp device, on which the statute is based, are sound, but whether they are so plainly unsound that they may confidently be characterized as unreasonable and capricious.

" 'If it has been enacted upon a belief of evils that is not arbitrary we cannot measure their extent against the estimate of the legislature.' (*Tanner v. Little,* supra, p. 385.   .   .   .

"The test as to whether an act is within the police power is, Has it a real relation to the public good? Does it tend to remove or diminish a practice that is injurious, obnoxious or inconvenient to the public? If the use of trading stamps tends to induce persons to make purchases beyond the limit which they would otherwise observe, and beyond their reasonable needs, it may be regarded as to that extent inimical to the interest of the public. For the state to attempt to protect the individuals constituting the general public from the consequences to themselves of their own improvidence may be highly paternalistic, but that does not prevent its being a legitimate exercise of the police power.

"The trading-stamp device offers an inducement to make purchases from the merchant using them, which is not connected with the merits of his goods, or with his customers' need of them. It lends itself readily to fostering a belief on the part of the buyer that the stamps cost him nothing—that they are given as lagniappe. And this may be true, in the sense that by their use the merchant saves enough in advertising so that he can and does make a less price to his customers. But that in a broad sense the buyer pays for all that he gets will hardly be disputed. There seems to be a widespread belief that there is an element of possible deception in this aspect of the scheme. Whether the plan may reasonably be expected to cause improvident purchases; whether in practice it does so; and whether it tends to mislead the buyer; are questions for the final determination of the legislature if there is any reasonable ground whatever for a difference of opinion on the subject. And if it be assumed that there is nothing of immorality or intentional deception in the plan itself, if by reason of the readiness of buyers to form a misconception concerning its operation—to overestimate its benefit to themselves—it works an injury to the public, the sacrifice of those who are compelled for the common good to forego the advantage of its use is only one of a number of instances in which a member of organized society is required to yield his own interests to those of his fellows—to abstain from conduct

which is innocent and harmless in itself, because of the effect which circumstances cause it to have upon others. We acquiesce in the view of the federal supreme court that there is sufficient room for a reasonable difference of opinion as to whether the 'premium system' is attended with evil consequences to the public, to place the affirmative decision of that question by the legislature beyond the reach of the courts, and, therefore, that a statute which places a special burden upon a business employing that device does not thereby so far infringe upon individual freedom of action and contract as to transcend the powers of government." (pp. 794, 796, 799.)

If the filled-milk statute under consideration is a proper exercise of the police power as thus defined, it violates neither the state nor federal constitutions. If, on the evidence in the case, there is room for a reasonable difference of opinion as to whether the products outlawed by the statute are attended with evil consequences to the public, either in the health of the people, or through fraud and deception in the purchase and use of the products, the judgment of the legislature as expressed in the statute may not be superseded by the views of this court.

The statute involved is a part of the public-health statute, which is chapter 65, G. S. 1935, and was originally enacted as it now stands, as chapter 242 of the Laws of 1927, and was defined in the preamble to the act to design standards for dairy products, and as such exists for the protection of the public health and general welfare of this state. The statute forms a part of the general milk, cream and dairy products law of this state and is, therefore, but one of a large number of specific acts designed to protect the public in the use and consumption of milk, cream and dairy products in the broad conception of those terms.

The obvious purpose of the statute being to safeguard the health of the citizens of the state, and the prevention of deception upon them, the gravity of the question placed before the court is fully realized.

The statute must, if possible, be so construed as to be constitutional. "It is a cardinal rule of construction that all statutes are to be so construed as to sustain them rather than ignore or defeat them and to give them operation if the language will permit, instead of treating them as meaningless." (Harkrader v. Whitman, 142 Kan. 186, 192, 46 P. 2d 1.) No statute should be declared unconstitutional unless its infringement of the superior law is clear beyond substantial doubt. (State, ex rel. Crawford, v. Robinson, 1 Kan. 17; Leavenworth County v. Miller, 7 Kan. 479.) Every presumption

is indulged in favor of the validity of legislative acts. If there is doubt as to the constitutionality of an act, such doubt must be resolved in favor of its validity.

It is clear the statute before us—usually referred to as the "filled-milk" statute—has a two-fold purpose: (1) Preservation of the public health, and (2) prevention of fraud and deception on the consumers of this state.

The evidence in the case going to the controverted issues is of a highly scientific nature. While a general summary of the evidence is unnecessary, vital portions will be referred to as we consider the various errors assigned.

Finding No. 9 of the trial court is assailed. It reads as follows:

"That there is a serious disagreement among experts on nutrition as to whether coconut oil is a pure, healthful and nutritious food. That the weight of the evidence does not show that coconut oil is a pure, nutritious and health-ful food and not harmful when used as food."

Appellant asserts that the court erred in refusing to make a finding on the issue of whether appellant's product (Carolene or Milnut) was a wholesome and nutritious product, and in basing its judgment upon a finding that there was a disagreement among the witnesses as to whether or not coconut oil was a wholesome and nutritious food product. It is contended that the trial court disposed of the case upon erroneous assumptions as to the issues of fact to be determined.

What were the issues raised by the pleadings? Paragraphs 5 and 6 are quoted above. Paragraph 5 of the petition alleges the manner in which plaintiff's product is made. In paragraph 6 it is alleged: "That the coconut oil used in the manufacture of Carolene and Milnut is a pure, wholesome and nutritious food product and that neither it nor any combination of it with skimmed milk and vitamins A and D as done by plaintiff, is deleterious."

The statute quoted above prevents the addition of any "fat or oil other than milk fat" to milk. It is conceded that plaintiff's product contains a fat other than milk fat—coconut oil. Plaintiff contends that this statute preventing the addition of fats other than milk fat is unconstitutional, as there is no basis in reason for it as regards coconut oil because such coconut oil is a wholesome and nutritious food product. The general denial of defendants put in issue whether or not coconut oil was, as plaintiff alleged, a pure, wholesome and nutritious food.

The statute does not prevent the sale of Carolene or Milnut by name—it prevents the sale of skim milk to which has been added any fat or oil other than milk fat. It is admitted that coconut oil is the oil that is added to the milk in plaintiff's product, and plaintiff pleads that such oil is a pure, wholesome and nutritious food. It would seem, therefore, that finding No. 9 was a definite finding of fact on the most vital issue in the case. The finding was supported by competent evidence, and we think the objections raised are without merit.

It is urged that the court erred in admitting the testimony upon which findings 10, 11, 12 and 13 are based, and in overruling plaintiff's motion to set the testimony aside. There was abundant testimony of grocers, dairy department inspectors and consumers to support these findings. However, the complaint is not as to the sufficiency of this evidence, but that no fraud was affirmatively pleaded by the defendants, and that plaintiff is not responsible for the conduct of merchants in the sale of its products and that plaintiff is not responsible for the fact its product has been palmed off on the public as and for genuine, whole, evaporated or condensed milk.

As heretofore stated, one of the chief purposes of the statute is the prevention of fraud and deception on the consuming public. If a product of this kind is sold cheaper with the recommendation that it is better than the genuine article and is placed in like containers and advertised and represented as a genuine article, such fact is a justifiable reason for the legislature to prevent its sale entirely. It was incumbent upon plaintiff, in seeking to overthrow the statute as being unconstitutional, to prove that there was no conceivable reason for the legislative act. Plaintiff not only failed entirely to make a showing that its product was not being fraudulently and deceptively sold, but, on the contrary, defendants' evidence, complained of by plaintiff, conclusively showed such fact to exist. Defendant was not seeking to prove a case of active fraud, as the term is ordinarily used in the law, but was merely seeking to show what the condition was against which the statute was directed and which condition the legislature no doubt could have conceived would exist if fats or oils such as coconut oil were permitted to be added to whole milk derivatives, and such condition is one of the things which the legislature, in its wisdom, had a right to guard the public against.

On this point the testimony tended to show: Carolene and Milnut are kept and displayed on the shelves and counters of retail stores in Kansas alongside of and with nationally advertised and widely known brands of genuine evaporated whole milk. Carolene and Milnut are advertised and sold as and for genuine evaporated whole milk in newspapers, posters and window displays. Carolene and Milnut are likely to be used as evaporated milk by fraud or mistake because they are identical in taste, odor, appearance and consistency; they are sold in the same size containers, are the same price, or cheaper in some instances, and their label indicates a superior quality and that it may be used as and for milk and evaporated milk. Some merchants, while it was being sold in the state of Kansas, advertised it and sold it as evaporated milk. Consumers, while it was being sold in the state of Kansas, purchased it for use in the diet of infants, children and adults because it was cheaper and because they thought it was evaporated milk. Persons most likely to be deceived by the size of the can and its other general appearance similar to evaporated milk are housewives who purchase the product for feeding children, particularly among the poorer class of people who may buy milk product in cans because it is cheaper in price.

The label on plaintiff's product contains, among other things, the following statements on the front, printed horizontally: "So rich it whips," in large, white letters on a red background, beneath which is depicted a picture of a cup containing an ingredient appearing to be coffee and above which is a hand holding a cream pitcher from which is being poured a substance resembling cream. To the right of this display on the front of the can or on the side are three pictures, one apparently some kind of a dessert upon top of which appears what is commonly referred to as whipped cream, and to the right of this picture appears the following words: "For better flavor and more inviting appearance serve whipped Milnut with all desserts." The second picture shows the freezing tray of an electric refrigerator, partially open, containing what appears to be some kind of frozen dessert, and to the right of this picture appear the following words: "Whipped Milnut in your favorite recipes or added to prepared mixes makes rich, smooth frozen desserts. Chill thoroughly before whipping." The third picture evidences a covered dish with the lid partially raised revealing some cooked food, and to the right of this appear the following words: "Use Milnut, di-

luted with an equal· amount of water, as a healthful, appetizing ingredient in all cooking and baking." On the left of the main front of the can, among other things, appears the following: "A high-grade wholesome food product, composed of a mixture of concentrated skimmed milk and highly refined coconut oil"; also, "Especially prepared for use in coffee, baking and for other culinary purposes." And also appears the following: "Approximate chemical constituents: Fat 6 percent, protein 7.75 percent, carbohydrates 10.72 percent, mineral salts 1.65 percent"; and also appears on the front of the can the following statement: "A compound of evaporated skimmed milk and refined coconut oil." There is a further statement as to the vitamin A and D content and a milk solid content, and vertically along the side of the can is written the following: "Not to be sold for evaporated milk."

Plaintiff's product has been advertised as and sold for evaporated milk by dealers who. did not read or see these statements on the label.

The statements on the label, "So rich it whips" and "Makes rich, smooth, frozen desserts," together with other stated purposes for which it may be used, together with the pictures thereon, imply to the ordinary person that it is wholly a milk product, and thereby misleads uninformed housewives and consumers.

When coconut oil is added to skimmed milk, milk or cream, the purchaser thereof is helpless to tell the difference between the resulting commodity and one containing a similar amount of butterfat. It is impossible to determine, by means of the Babcock test, whether or not coconut oil has been substituted for butterfat in milk, skimmed milk or cream. There is no way for the dairyman or the housewife to identify or to distinguish between butterfat (in pure milk) and coconut oil (in Milnut and Carolene) because the Babcock test reacts similarly to both fats.

It is therefore evident that the objections made to the findings of the trial court are without foundation, and the motion to set the same aside was properly overruled. As the findings are supported by substantial, competent evidence, they will not be disturbed on appeal. (*Voiland Printing Co. v. Christman*, 139 Kan. 289, 81 P. 2d 17; *Bennett v. Glazier*, 145 Kan. 571, 66 P. 2d 370.) As the findings covered the material issues the request for additional findings was properly refused. In *Oil and Gas Co. v. Strauss*, 110 Kan. 608, 203 Pac. 1111, it was held:

"It is not error to overrule a request for additional findings of fact where the request comes in the form of questions practically constituting a cross-examination of the court on findings that have been made." (Syl. ¶ 3.)

Plaintiff has challenged the constitutionality of the statute. The statute declares that it shall be unlawful to manufacture or sell any milk to which has been added "any fat or oil other than milk fat." The ultimate question presented is whether the state may declare that the manufacture and sale of milk so adulterated is unlawful. The question came before the supreme court of the United States in *Hebe Co. v. Shaw*, 248 U. S. 297, 63 L. Ed. 255, 39 S. Ct. 125. It was there said:

"It is argued that, as Hebe is a wholesome, or not unwholesome, product, the statutes should not be construed to prohibit it if such a construction can be avoided, . . . It seems entirely clear that condensed skimmed milk is forbidden out and out. But if so, the statute cannot be avoided by adding a small amount of coconut oil. We may assume that the product is improved by the addition, but the body of it still is condensed skimmed milk, and this improvement consists merely in making the cheaper and forbidden substance more like the dearer and better one, and thus at the same time more available for a fraudulent substitute. It is true that, so far as the question of fraud is concerned, the label on the plaintiffs' cans tells the truth—but the consumer in many cases never sees it. Moreover, when the label tells the public to use Hebe for purposes to which condensed milk is applied, and states of what Hebe is made, it more than half recognizes the plain fact that Hebe is nothing but condensed milk of a cheaper sort.

"We are satisfied that the statute as construed by us is not invalidated by the fourteenth amendment. The purposes to secure a certain minimum of nutritive elements, and to prevent fraud, may be carried out in this way even though condensed skimmed milk and Hebe both should be admitted to be wholesome. The power of the legislature 'is not to be denied simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat.' (*Purity Extract & Tonic Co. v. Lynch*, 226 U. S. 192, 204, 57 L. Ed. 184, 188, 33 Sup. Ct. Rep. 44.) If the character or effect of the article as intended to be used 'be debatable,' the legislature is entitled to its own judgment, and that judgment is not to be superseded by the verdict of a jury, or, we may add, by the personal opinion of judges, 'upon the issue which the legislature has decided.' (*Price v. Illinois*, 238 U. S. 446, 452, 59 L. Ed. 1400, 1405, 35 Sup. Ct. Rep. 892; *Rast v. Van Deman & L. Co.*, 240 U. S. 342, 357, 60 L. Ed. 679, 687, L. R. A. 1917A, 421, 36 Sup. Ct. Rep. 370, Ann. Cas. 1917B, 455.) The answer to the inquiry is that the provisions are of a kind familiar to legislation and often sustained, and that it is impossible for this court to say that they might not be believed to be necessary in order to accomplish the desired ends."

In the recent case of *U. S. v. Carolene Products Co.*, 304 U. S. 144, 82 L. Ed. 1234, 53 S. Ct. 778, the Hebe case was approved in the following passage:

"The prohibition of shipment of appellee's product in interstate commerce does not infringe the fifth amendment. Twenty years ago this court, in *Hebe Co. v. Shaw*, 248 U. S. 297, held that a state law which forbids the manufacture and sale of a product assumed to be wholesome and nutritive, made of condensed skimmed milk, compounded with coconut oil, is not forbidden by the fourteenth amendment. The power of the legislature to secure a minimum of particular nutritive elements in a widely used article of food and to protect the public from fraudulent substitutions, was not doubted; and the court thought that there was ample scope for the legislative judgment that prohibition of the offending article was an appropriate means of preventing injury to the public.

"We see no persuasive reason for departing from that ruling here, where the fifth amendment is concerned; and since none is suggested, we might rest decision wholly on the presumption of constitutionality. But affirmative evidence also sustains the statute. In twenty years evidence has steadily accumulated of the danger to the public health from the general consumption of foods which have been stripped of elements essential to the maintenance of health. The filled-milk act was adopted by congress after committee hearings, in the course of which eminent scientists and health experts testified. An extensive investigation was made of the commerce in milk compounds in which vegetable oils have been substituted for natural milk fat, and of the effect upon the public health of the use of such compounds as a food substitute for milk. The conclusions drawn from evidence presented at the hearings were embodied in reports of the House Committee on Agriculture, H. R. No. 365, 67th Cong. 1st Sess., and the Senate Committee on Agriculture and Forestry, Sen. Rep. No. 987, 67th Cong. 4th Sess. Both committees concluded, as the statute itself declares, that the use of filled milk as a substitute for pure milk is generally injurious to health and facilitates fraud on the public.

"There is nothing in the constitution which compels a legislature, either national or state, to ignore such evidence, nor need it disregard the other evidence which amply supports the conclusions of the congressional committees that the danger is greatly enhanced where an inferior product, like appellee's, is indistinguishable from a valuable food of almost universal use, thus making fraudulent distribution easy and protection of the consumer difficult." (p. 148.)

In *State v. Wilson*, supra, this court said:

"There seems to be a widespread belief that there is an element of possible deception in this aspect of the scheme. Whether the plan may reasonably be expected to cause improvident purchases; whether in practice it does so; and whether it tends to mislead the buyer; are questions for the final determination of the legislature if there is any reasonable ground whatever for a difference of opinion on the subject." (p. 799.)

In *Schaake v. Dolley,* 85 Kan. 598, 605, 118 Pac. 80, it was stated:

"When once a subject is found to be within the scope of the state's police power the only limitations upon the exercise of the power are that regulations must have reference in fact to the welfare of society and must be fairly designed to protect the public against evils which might otherwise occur. Within these limits the legislature is the sole judge of the nature and extent of the measures necessary to accomplish its purpose. It may even go so far as to establish a monopoly. . . ."

In *State v. Addington,* 77 Mo. 110, the defendant was prosecuted for selling oleomargarine in violation of a statute which prohibited the manufacture and sale of such products "to take the place of butter or cheese, produced from pure, unadulterated milk or cream."

The court stated:

"Relative to the offer of defendant to prove that the article he sold was wholesome as an article of food, the testimony as adjudged by the trial court was wholly irrelevant. The position of the defendant in substance is, that if the wholesomeness of the article as one of food could be established, that thereby the constitutionality of the act which forbids its sale would be overthrown. This is clearly a *non sequitur.* Such a position, if pushed to its logical conclusion, would utterly overthrow the exercise of the police power by the state; overthrow every law the wisdom of which could not bear the test of scrutiny." (p. 116.)

In *Powell v. Commonwealth,* 114 Pa. 265, 7 Atl. 913, the supreme court of Pennsylvania in considering the constitutionality of a statute which prohibited the manufacture and sale of oleomargarine to take the place of butter, said:

". . . The manufacture, sale and keeping with intent to sell, may all alike be prohibited by the legislature, if in their judgment the protection of the public from injury or fraud requires it. To deny the authority of the legislature to do so, is to attack all that is vital in the police power. . . .

"The fact that the prohibited substances, in a pure state, may be wholesome and not injurious, is irrelevant in a judicial inquiry. Their wholesomeness will not render the act unconstitutional. The statute is intended to prevent fraud and protect the public health by prohibiting the manufacture and sale of substances and compounds which furnish the temptation to commit the former, and which may be injurious to the latter. As was said by the supreme court of Missouri, in *State v. Addington,* 77 Mo. 110, the position, that to render the law unconstitutional the prohibited articles must be unwholesome, would utterly overthrow the police power of the state—overthrow every law, the wisdom of which could not bear the test of scrutiny." (pp. 294, 295.)

The Powell decision was affirmed by the United States supreme court. (*Powell v. Pennsylvania*, 127 U. S. 678, 8 S. Ct. 992, 32 L. Ed. 253.) It was there stated:

"It is scarcely necessary to say that if this statute is a legitimate exercise of the police power of the state for the protection of the health of the people, and for the prevention of fraud, it is not inconsistent with that [fourteenth] amendment; for it is the settled doctrine of this court that, as government is organized for the purpose, among others, of preserving the public health and the public morals, it cannot divest itself of the power to provide for those objects; and that the fourteenth amendment was not designed to interfere with the exercise of that power by the states. . . .

"Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in such a way, or with such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative department to determine. . . ." (pp. 683, 685.)

In Black on Constitutional Law (Hornbook Series, 4th ed.), page 379, it is stated:

"It is within the legitimate scope of the police power to prohibit the adulteration or misbranding of articles intended for human food. When the adulteration consists in the addition of an artificial preservative or of something dangerous or injurious to health, the ground of interference by law is clear, and the judgment of the legislature as to the deleterious character of the adulterant will generally be accepted by the courts as conclusive. When the added ingredient is harmless in itself, the sale of the adulterated compound may still be forbidden on the ground of the fraud and deception practiced in its sale. This principle has been applied to statutes making it a crime to sell meat falsely represented to be 'kosher,' or prohibiting the sale of cream containing less than twenty percent of butterfat, and to laws requiring all packages of fruit to be stamped with a true statement of the place where grown. Laws prohibiting, regulating, or taxing the manufacture or sale of oleomargarine are in the same class."

In *Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, the order of the milk control board in fixing the price of milk to consumers was sustained. It was there said:

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally funda-

mental with the private right is that of the public to regulate it in the common interest. . . .

"These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need." (pp. 523, 524.)

Notwithstanding these established principles, plaintiff insists that the trial court erred in not making a finding as to whether or not plaintiff's product was a wholesome and nutritious product. We are unable to agree with that contention.

In the brief of defendants we are furnished with a list of thirty-one states that prohibit the manufacture and sale of filled milk, and of other states that regulate or impose conditions on such manufacture and sale. In New York a legislative committee made an investigation of the milk industry. In the Nebbia case the report of the committee was summarized:

"Milk is an essential item of diet. It cannot long be stored. It is an excellent medium for growth of bacteria. These facts necessitate safeguards in its production and handling for human consumption which greatly increase the cost of the business. Failure of producers to receive a reasonable return for their labor and investment over an extended period threaten a relaxation of vigilance against contamination.

"The production and distribution of milk is a paramount industry of the state, and largely affects the health and prosperity of its people. Dairying yields fully one-half of the total income from all farm products. Dairy farm investment amounts to approximately $1,000,000,000. Curtailment or destruction of the dairy industry would cause a serious economic loss to the people of the state." (p. 516.)

The production and distribution of pure milk is a matter of universal concern. The peculiar value of milk as a food for infants and children is a matter of common knowledge. The attempt to palm off milk compounds to the consumer has received the consideration of not only the state, but the federal government. As stated in *U. S. v. Carolene Products Co.*, supra, the federal filled-milk act was adopted by congress after committee hearings, in the course of which eminent scientists and health experts testified. (A summary of the committee report is given in a note to that case.) In the Hebe case the United States supreme court declared that "if the

character and effect of the article as intended to be used 'be debatable the legislature is entitled to its own judgment. . . .' " The declaration of the police power of the state, as set forth by this court in *State v. Wilson,* supra, and other cases, is of the same import. But if the added ingredient is harmless in itself, the legislature may prohibit the manufacture and sale of the adulterated compound on the ground of the fraud and deception practiced in its sale. On either theory, upon the record before us, the judgment of the trial court must be affirmed. It is so ordered.