No. 41,591

In the Matter of the Estate of F. SYLVESTER DIEBOLT, An Insane Person, MAE ELLEN DIEBOLT, Guardian, *Appellant*, v. F. SYLVESTER DIEBOLT, *Appellee*.

(353 P. 2d 803)

Opinion filed July 2, 1960.

*Emmet A. Blaes,* of Wichita, argued the cause, and *W. D. Jochems; J. Wirth Sargent; Roetzel Jochems; Robert G. Braden; J. Francis Hesse; James W. Sargent; Stanley E. Wisdom; Vincent L. Bogart; Cecil E. Merkel; John W. Brimer;* and *Harry L. Hobson,* all of Wichita, were with him on the briefs for the appellant.

*Robert F. Bailey,* of Wichita, argued the cause, and *C. H. Morris,* of Wichita, was with him on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, C. J.: This appeal stems from a judgment rendered by the district court of Sedgwick County in which that tribunal affirmed an order of restoration issued by the Probate Court of Sedgwick County.

In order to fully understand the issues a somewhat detailed statement of the facts, which are not in dispute, is required.

During the month of June, 1956, F. Sylvester Diebolt was adjudged an insane person by the Probate Court of Sedgwick County. On July 6, 1956, that court appointed Sylvester's wife, Mae Ellen Diebolt, as guardian of his person and estate. Thereafter, and on September 5, 1956, Mr. Diebolt, having been committed by such

court, was admitted to the state hospital for the insane at Larned. After being admitted thereto Sylvester was allowed to leave the Larned hospital on a trial basis. Subsequently, and on February 20, 1958, the probate judge of Sedgwick County received a letter from the superintendent of such hospital, pertinent portions of which read:

"I hereby notify you that Sylvester Diebolt, a patient from your county, was on the 12th day of February, 1958, discharged as restored to capacity from this institution while on trial visit."

Upon receipt of the foregoing notice the Probate Court issued the following order:

"Now, on this 20th day of February, 1958, notice of restoration of Sylvester Diebolt having been received from J. T. Naramore, M. D., Superintendent of the Larned State Hospital; it is therefore Ordered that Sylvester Diebolt was discharged on the 12th day of February 1958 and that he is hereby adjudged restored to his right mind and to all his rights of citizenship."

It is conceded the foregoing order was made under the provisions of G. S. 1949, 59-2276, which read:

"When notice is received from the superintendent of a state hospital by the court of the patient's residence that a patient has been discharged as restored to capacity, the court shall make an order that the patient has been restored to capacity."

On March 28, 1958, Mae Ellen Diebolt, as guardian of the person and estate of Sylvester, perfected an appeal from the above-quoted probate court order to the district court. Insofar as the proceedings in the district court are concerned, the record, aside from colloquy of counsel and rulings by the trial court on proffered exhibits, discloses that two exhibits were introduced in evidence on behalf of the guardian.

The first exhibit consisted of certain rules and regulations pertaining to discharges, dismissals and paroles from state hospitals as defined in G. S. 1947 Supp., 59-2001, now G. S. 1949, 59-2001. These were certified by the assistant revisor of statutes of and for the State of Kansas as being rules promulgated by the State Board of Social Welfare which had been on file in the office of the revisor of statutes without change since July 29, 1948.

In passing it might be well to note for purposes of clarification that the agency known as the State Board of Social Welfare was abolished (G. S. 1949, 75-3308) and all powers, duties, authority and jurisdiction theretofore exercised by it were transferred to a

new agency, the State Department of Social Welfare (G. S. 1949, 75-3301, *et seq.*). The State Hospital for the insane at Larned was one of the institutions transferred to the control of the new department.

The second exhibit was a letter dated July 21, 1958, and signed by counsel for the State Department of Social Welfare. It reads in part as follows:

"We do not have any rules and regulations regarding discharges except a board minute delegating the authority to the superintendent of each hospital'

The district court allowed the parties to file briefs at the conclusion of the trial and thereafter, having been advised as to their contentions, made findings and rendered a judgment which, so far as here pertinent, reads:

"The court . . ., finds that Section 59-2276, G. S. 1949, is not unconstitutional and that the order of restoration entered by the Probate Court on February 20, 1958, complied with the foregoing statute and was based upon a finding of fact lawfully made by the Superintendent of the State Hospital at Larned, Kansas, who had authority so to do.

"It Is Therefore . . . Adjudged and Decreed that the order of the Probate Court . . ., was lawfully made and said order is hereby affirmed."

Within the time prescribed by law, the guardian duly perfected the instant appeal.

Since matters similar in character to those covered by G. S. 1949, 59-2276, which, it is to be noted, is now challenged in this court as unconstitutional for the first time, have long been the subject of legislative action in Kansas, we have deemed it necessary to review pertinent pre-existent statutes in approaching consideration of the issues here involved. That research has been so enlightening we feel the result thereof may be of interest, as well as benefit, to the bench and bar, hence somewhat extended reference to what it has disclosed will be made in this opinion.

For many years the laws of this state (1) authorized superintendents of mental hospitals to discharge committed lunatics and/or insane persons from such institutions, and (2) provided that notice should be given the probate judge of the proper county of such discharge, who, upon receipt of the notice, should make a corresponding entry upon the records of this court. This was the situation from 1885 until 1901. See G. S. 1885, §§ 3324, 3325; G. S. 1889, §§ 3730, 3731; G. S. 1899, §§ 3855, 3856; G. S. 1901, §§ 3991, 3992.

All sections of the statutes above listed contain identical language.

Those conferring power to discharge read:

"The person or court placing a patient in the asylum shall have the power to remove such patient at any time, and the superintendent shall have power, under the direction of the trustees, to discharge any patient at any time in accordance with the by-laws of the asylum. . . ." (G. S. 1901, § 3991.)

Those relating to proceedings after the institutional discharge read:

"When a patient is ordered discharged, the steward shall immediately notify the probate judge of the proper county of such discharge, giving the name of the patient and date of discharge, and whether the patient is restored to his right mind or not. The judge shall, when he receives the notice, make a corresponding entry on the records of his court; . . ." (G. S. 1901, § 3992.)

Sections of the above-mentioned statutes were changed by Laws of 1901, Chapter 353.

So far as here pertinent, section 71 of that enactment reads:

"Authority to discharge patients from either of the state institutions for the insane is vested in the state board of charities and corrections, but may be delegated to the superintendent, under such regulations as the board may see fit to adopt. Discharges may be made for any of the following reasons: Because the person so adjudged is not insane; or because he has recovered from the attack of insanity; . . ."

Section 72 thereof, relating to procedure to be followed after the discharge of a patient from a state hospital as cured, provides:

"When notice shall be given to the probate judge of any county that a patient committed to any hospital in the state upon order of said court has been discharged *as cured,* under [upon] receipt of such notice, signed by the superintendent, whose duty it shall be to give notice of every such case, *the probate judge shall enter upon his docket an order restoring the patient in question to all his rights as a citizen, and if a guardian shall have been appointed, said guardian shall be removed.* . . ." (Emphasis supplied.)

No changes were made in the provisions of sections 71 and 72, chapter 353, laws of 1901, for many years. See G. S. 1909, §§ 8483, 8484, and G. S. 1915, §§ 9616, 9617.

See, also, R. S. 1923, 76-1224 and 76-1225, disclosing that when the statute was revised in 1923, the only change made by the revisors in G. S. 1909, §§ 8483, 8484, and G. S. 1915, §§ 9616, 9617, was to substitute the words "the board of administration" in lieu of "the state board of charities and corrections" in 76-1224, and that that change was made because of a statutory enactment giving the board of administration charge and jurisdiction over state hospitals for the insane. And see G. S. 1935, 76-1224 and 76-1225.

As a matter of fact sections 71 and 72 of chapter 353, laws 1901,

were not changed by the legislature until the enactment of the probate code in 1939, during all of which time, a period of thirty-eight years, as has been previously indicated, the law directed the probate judge, upon receipt of a notice of discharge of an insane person from the superintendent of a mental hospital as cured, *to enter an order restoring the patient in question to all his rights as a citizen, and if a guardian had been appointed to remove and discharge such guardian.*

In 1939 the legislature enacted what is now known as the Kansas Probate Code (Laws of 1939, chapter 180).

The authority to discharge patients from state hospitals for the insane is to be found in section 171, Laws of 1939, under article 20, which is titled "Commitment and Care of Insane Persons." No substantial change in prior statutes relating to the discharge of insane persons from state hospitals was there made. So far as pertinent, section 171 reads:

"*Authority to discharge patients from state hospitals* for the insane *is vested in the board of administration,* but may be delegated to the superintendent, under such regulations as the board shall adopt. Discharges may be made for any of the following reasons: (1) The patient is not insane. (2) He has been restored to capacity. . . ."

It is to be noted the section of Laws of 1939 last quoted now appears in G. S. 1949, 59-2007, and that the only change in its language is the substitution of the term "State department of social welfare" for "board of administration," and the word "department" in lieu of "board"; those changes being necessary because of Laws of 1949, chapter 446, sections 11 and 12 (now G. S. 1949, 75-3307, 75-3308), providing that all the jurisdiction, powers and duties relating to state hospitals for the insane are now conferred upon the state department of social welfare instead of the state board of administration.

However, it should be pointed out section 169, Laws of 1939, of the probate code is entirely new. It reads:

"Upon delivery of an insane patient to the state hospital to which he has been committed, the superintendent thereof shall retain the duplicate warrant and endorse his receipt upon the original, which shall be filed in the court of commitment. *After such delivery, the patient shall be under the care, custody, and control of the board of administration until discharged by it or by a court of competent jurisdiction.* . . . Whenever a patient in a state hospital is duly adjudged not to be insane he shall be discharged therefrom." (Emphasis supplied.)

The foregoing section of the Code is now G. S. 1949, 59-2005. This section of the current statute, except for the substitution of the term "Department of social welfare" inserted in lieu of "board of administration" as required by Laws of 1949, chapter 446, sections 11 and 12 (now G. S. 1949, 75-3307 and 75-3308) as above mentioned, remains the same as when enacted in 1939.

The new probate code also deals with the notice of discharge to be sent to the probate court of the patient's residence when he has been discharged as restored to capacity and the making of an order by such court when the notice is received. The provisions dealing therewith appear in section 252, under article 22 titled "Probate Procedure," chapter 180, Laws of 1939. Section 252 has not been changed since the enactment of the code. It now appears in G. S. 1949, 59-2276, which, although it has been heretofore quoted, will be restated, for purposes of emphasis, because of drastic changes therein made in pre-existing statutes with respect to procedure in the probate court after receipt of a notice of discharge. It reads:

"When notice is received from the superintendent of a state hospital by the court of the patient's residence that a patient has been discharged as restored to capacity the court shall make an order that the patient has been restored to capacity."

From what has been heretofore related it can be stated a careful and extended examination of all of the statutes, to which we have previously referred, makes it clearly appear (1) that by legislative fiat, at least since 1901, *power and authority to discharge an insane patient from a state hospital for the insane as cured or restored to capacity,* with the right to delegate that power and authority to the institutional superintendent, has been vested in the state board or commission having charge and control of the institution to which the patient was committed and (2) that in enacting the 1939 code the legislature eliminated from our statutes entirely the pre-existing thirty-eight-year requirements, directing that when the probate judge received a notice from the superintendent of a state hospital that an insane person committed from his county had been discharged from that institution as cured such judge should enter an order restoring the patient in question to all his rights as a citizen and remove his guardian if one had been appointed, and in lieu thereof substituted a requirement that upon receipt of a notice from the superintendent of a state hospital that a patient had been

discharged therefrom as restored to capacity the probate court of the patient's residence should make an order that such patient had been restored to capacity.

Although in preliminary comments appellant states that this case involves the constitutionality of G. S. 1949, 59-2276, it is clear from many arguments advanced in her brief in support of that position she is also claiming that G. S. 1949, 59-2007, providing the superintendent may discharge a patient from a state hospital as restored to capacity, is also invalid. That this is so is evidenced by statements to the effect restoration of an insane person is a matter which is strictly and absolutely a judicial function which can best be determined from reading article 3, section 8 of the constitution of the State of Kansas from which, emphasizing the language on which she relies to support this position, she quotes as follows:

"There shall be a probate court in each county, which shall be a court of record, and have such probate jurisdiction and care of estates of deceased persons, minors, *and persons of unsound minds,* as may be prescribed by law. . . . (Emphasis supplied.)

Specifically, as we understand it, appellant's first contention with respect to the validity of 59-2007, *supra,* is based on her theory the foregoing provisions of the constitution give probate courts exclusive jurisdiction over persons of unsound minds and thus prohibit the legislature from granting any state department or official the right to discharge a patient from a state hospital after he had been committed thereto as insane by a probate court.

After consideration of the above-quoted provisions of the constitution which, except for the emphasis added, are correctly quoted, both as to language and punctuation, we are convinced the short and simple answer to the claim now under consideration is to be found in the provisions themselves. In our opinion, when correctly analyzed, they are to be construed as granting probate courts jurisdiction and care of estates of persons of unsound minds but do not, as appellant contends, grant such courts exclusive jurisdiction over persons of unsound minds.

We believe our construction of the foregoing constitutional provisions finds support in the fact that the framers of the new Kansas Probate Code, as well as the legislature in enacting it, saw fit to give probate courts original jurisdiction of all matters pertaining to the appointment and removal of guardians for incompetent persons but, while giving them like jurisdiction to commit insane persons to

hospitals, failed to give them exclusive jurisdiction over the discharge of insane persons from hospitals after commitment.

See G. S. 1949, 59-301, which reads:

"The probate courts shall be courts of record, and, within their respective counties, shall have original jurisdiction:

. . . . . . . . . . . . . .

"(6) To appoint and remove guardians for minors and incompetent persons, to make all necessary orders relating to their estates, to direct and control the official acts of such guardians, and to settle their accounts.

. . . . . . . . . . . . . .

"(10) To hold inquests respecting insane persons, and to commit insane persons to hospitals for the insane, or elsewhere, for their care and treatment."

The same holds true of our decision in *Starke v. Starke*, 155 Kan. 331, 125 P. 2d 738, where it is held:

"The original jurisdiction over estates of incompetent persons conferred by the probate code (G. S. 1941 Supp. 59-301 [6] [12] and 59-1801 *et seq.*) rests exclusively in the probate court." (Syl. ¶ 1.)

And in the opinion said:

"*The power of probate courts to deal with the property of insane persons roots in the constitution of the state.* Article 3, section 8 of the constitution provides that 'There shall be a probate court in each county, which shall be a court of record, and have such probate jurisdiction and care of estates of deceased persons, minors, and persons of unsound minds, as may be prescribed by law.' . . ." (Emphasis supplied.)

Another claim with respect to 59-2007, *supra*, necessarily involved because of arguments advanced by appellant with respect to 59-2276, *supra*, is that it violates our state constitution because it encroaches upon the judiciary in that it attempts to grant judicial powers to a purely administrative board or official.

Keeping in mind that a person who is adjudged to be insane is committed to a state hospital because, at the time of his commitment, his mental condition is such he might injure himself or others with whom he might come in contact and is therefore unsafe to be at large; likewise that, under the statute (G. S. 1949, 59-2005), on his delivery to the hospital to which he has been committed, he shall be under the care, custody and control of the state department of social welfare until discharged by it or by a court of competent jurisdiction; and mindful that after he is committed his mental condition may so improve that he is no longer dangerous to himself or others and is therefore restored to capacity from the standpoint of the reasons for which he was deprived of his liberty under the commitment, what is the force and effect to be given the provisions of

59-2007, *supra?* We believe they are to be construed as providing that, when an insane person recovers from the mental condition responsible for his commitment to the extent he is no longer dangerous to himself or others, the state department of social welfare, or if delegated that authority the superintendent of the hospital where he is confined, is vested with power and authority to discharge him from such hospital as restored to capacity from the standpoint of the purposes for which he was committed.

Appellant cites no cases, in this or foreign jurisdictions, holding that, when so construed, the statute (59-2007), or others of like import, are invalid for the reason now under consideration. Moreover, our independent research discloses a wealth of authority establishing that statutes similar to 59-2007, *supra*, have long been in force and effect and recognized and applied as valid statutory enactments. For general treatises to this effect see 44 C. J. S., Insane Persons, pp. 172, 173, § 72, and 29 Am. Jur., Insane Persons, pp. 173, 174, §§ 46, 47. For cases from foreign jurisdictions, see *Hatton v. Board of Control*, 146 Tex. 160, 204 S. W. 2d 390; *In re Pfeiffer*, 10 Wash. 2d 703, 118 P. 2d 158; *Reno v. Love et al.*, 25 Ohio Cir. Ct. (n. s.) 129; *In re Chason*, 293 N. Y. S. 972, 162 Misc. 539; *Kellogg v. Cochran*, 87 Cal. 192, 25 Pac. 677 *Knorp v. Board of Police Commissioners*, 31 Cal. App. 539, 161 Pac. 12; *State, ex rel., v. Lamneck*, 133 Ohio St. 257, 13 N. E. 2d 127; *Byers v. Solier*, 16 Wyo. 232, 93 Pac. 59; *In re Remus*, 119 Ohio St. 166, 162 N. E. 740; *State v. Griffith*, (Ohio Ct. App.) 36 N. E. 2d 489. See, also, our own case of *In re Timm*, 129 Kan. 126, 281 Pac. 863, where it is held:

"The constitutionality of R. S. 62-1532 considered, as being an attempt to convey judicial powers upon a purely administrative board and held not to be unconstitutional because the powers and duties conveyed or conferred are not necessarily judicial." (Syl. ¶ 2.)

And in the opinion said:

"Applying the definitions of judicial functions or powers given in 6 R. C. L. 160 and other authorities cited, we think this matter is far from being a judicial function. It does not involve any question of law or discretion. It is a question of fact. Has the petitioner been restored to sanity? Physicians and other experts are called as witnesses to give their opinions after examination and observation. If the court should hear and determine it, a jury not necessarily of twelve would be called to determine the matter from those opinions. Instead of such jury the board of administration is authorized to hear and determine the fact as to restored sanity. Restoration is quite different from commitment on a finding of insanity in that some one is by the latter proceeding deprived of his liberty and possibly deprived of the control of his property. Of course the

public is to be protected by preventing the release and discharge of one not fully restored and who might put others in danger by his release. But no good reason has been suggested why the board of administration could not after a full hearing protect the public fully as well as a court, and possibly better by having a larger experience with such matters and better opportunity for observation of mentally abnormal persons." (pp. 129, 130.)

With its provisions construed as previously indicated we have no difficulty in concluding it cannot be successfully argued 59-2007, *supra*, is unconstitutional for any reason heretofore advanced or discussed.

Having disposed of questions involving the validity of 59-2007, *supra*, it can now be stated that the principal issue raised by appellant in this appeal is that "the Court erred in holding that G. S. 1949, 59-2276 is constitutional inasmuch as the statute attempts to convey a judicial function or power to an administrative board or individual and is therefore an encroachment upon judicial power and the statute as written also violates the due process clause of the Constitution of the United States."

At the outset it should be stated this claim, like the others to which we have previously referred, must be disposed of in the light of long-established rules of this jurisdiction governing judicial examination of any law enacted by the legislature when it is challenged as unconstitutional.

In this connection it may be stated this court has always approached consideration of questions challenging the constitutionality of statutes with the disposition to determine them in such manner as to sustain the validity of the enactment in question.

In the first published report of this court in *State of Kansas, ex rel., Crawford v. Robinson and others*, 1 Kan. 17, 18, we held:

"A statute will not be declared unconstitutional, unless its infringement of the superior law is clear, beyond substantial doubt . . ."

See *Leavenworth Co. v. Miller*, 7 Kan. (2nd Ed.) 479, 480, which holds:

"All presumptions are in favor of the constitutional validity of a statute; and before the courts can declare it invalid, it must clearly appear to be unconstitutional." (Syl. ¶ 8.)

Later in *Glenn v. Callahan*, 125 Kan. 44, 47, 262 Pac. 583, we quoted and reapproved the rule announced in 1 Kan. 17.

Still later in *Barker v. Kansas City*, 149 Kan. 696, 698, 88 P. 2d 1071, we quoted and reaffirmed the rule announced in 7 Kan. (2nd Ed.) 479, 480, Syl. ¶ 8.

For a more recent pronouncement on the same subject see *State, ex rel., v. Urban Renewal Agency of Kansas City,* 179 Kan. 435, 296 P. 2d 656, where it is held:

"Judicial examination of any law enacted by the legislature proceeds on the assumption that it is valid unless it contravenes an express inhibition of the constitution or one necessarily implied from some express affirmative provision of that instrument, and an act of the legislature is not to be stricken down on the ground it is unconstitutional unless infringement of the superior law is clear beyond reasonable doubt." (Syl. ¶ 1.)

And for a more recent decision reaffirming the foregoing rules see *State, ex rel., v. Fadely,* 180 Kan. 652, 308 P. 2d 537, where it is held:

"Constitutionality of a statute is presumed, doubts as to its constitutionality are resolved in favor of legality, and before a statute may be stricken down it must clearly appear it offends applicable constitutional provisions.

"In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done." (Syl. ¶¶ 1, 2.)

And in the opinion said:

"As preliminary to a consideration of the contentions of the plaintiff, we refer to long well-established rules of this jurisdiction to the effect that the constitutionality of a statute is presumed and that all doubts must be resolved in favor of its legality and before the statute may be stricken down it must clearly appear the statute violates the constitution (*Carolene Products Co. v. Mohler,* 152 Kan. 2, 102 P. 2d 1044; *Board of County Comm'rs v. Robb,* 166 Kan. 122, 199 P. 2d 530; *State, ex rel., v. Board of Regents,* 167 Kan. 587, 207 P. 2d 373); that it is the court's duty to uphold the legislation rather than defeat it and if there is any reasonable way to construe the legislation as constitutionally valid, that should be done (*Marks v. Frantz,* 179 Kan. 638, 298 P. 2d 316); that, at the threshold of the inquiry of validity of a statute, courts start with the presumption the lawmakers intended to enact a valid law and to enact it for the accomplishment of a needful purpose (*State, ex rel., v. Board of Education,* 137 Kan. 451, 453, 21 P. 2d 295); that courts do not strike down legislative enactments upon the mere ground they fail to conform with a strictly legalistic definition or technically correct interpretation of constitutional provisions; rather, the test is whether the legislation conforms with the common understanding, the true intention, of the people at the time they adopted the constitutional provision and the presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who adopt them (*Hunt v. Eddy,* 150 Kan. 1, 90 P. 2d 747); . . ." (pp. 658, 659.)

In this jurisdiction a fundamental rule, to which all others are subordinate, is that the purpose or intent of the legislature governs when that intent can be ascertained from the statute, even though words, phrases or clauses at some place in the statute must be

omitted or inserted (*Hunziker v. School District*, 153 Kan. 102, 107, 109 P. 2d 115, and cases there cited). See, also, West's Kansas Digest, Statutes, § 181, and Hatcher's Kansas Digest [Rev. Ed.], Statutes, § 71.

Another rule of equal importance is that in construing a statute the legislative intention is to be determined from a general consideration of the whole act. Effect must be given, if possible, to the entire statute and every part thereof. To this end it is the duty of the court, so far as practicable, to reconcile the different provisions so far as to make them consistent and sensible. (*Iola B. & L. Ass'n v. Allen County Comm'rs*, 152 Kan. 365, 103 P. 2d 788.) This rule, stated in various forms, has been applied by this court throughout its history. See West's Kansas Digest, Statutes, § 205, and Hatcher's Kansas Digest [Rev. Ed.], Statutes, § 77.

Having stated the applicable rules governing judicial examination of any statute, when its constitutionality is attacked, we now direct our attention to the provisions of 59-2276, *supra*, which, since it has been heretofore set forth at length, will not be requoted.

At the outset it should be pointed out there are certain undeniable, but nevertheless important and decisive, factors which must be taken into consideration before giving construction to the language of such section. They are: (1) That the probate code is a single legislative enactment (Laws of 1939, Chapter 180, now G. S. 1949, 59-101 to 59-2602, incl., with subsequent amendments appearing in G. S. 1959 Supp., 59-101 to 59-2602, incl.) and that all its provisions must be construed together and, if possible, harmonized in giving them force and effect; (2) that in section 17 (59-301[6], *supra*) of such enactment the legislature, in clear and unequivocal language, gave probate courts exclusive original jurisdiction over the appointment and removal of guardians for incompetent persons; (3) that in cases where a person had been committed to a state hospital by a probate court as insane the legislature in section 171 (59-2007, *supra*) of such code, as heretofore construed, vested the state department of social welfare, or if delegated that authority, the superintendent of the hospital to which such person had been committed, with power and authority to *discharge him from such hospital as restored to capacity from the standpoint of the purposes for which he had been committed;* and (4) that in section 280 of such enactment the legislature expressly repealed G. S. 1935, 76-1225, a statute which had been in existence for more

than thirty-eight years, providing that when the probate judge received a notice from a superintendent of a state hospital that an insane person committed from his county had been discharged from that institution as cured *such judge must enter an order restoring him to all his rights as a citizen and remove his guardian if one had been appointed.*

We are not disposed to prolong this opinion by detailing our views respecting the proper construction to be given the provisions of section 252 (59-2276, *supra*) of the probate code which, as we have previously pointed out, were substituted for the repealed provisions of G. S. 1935, 76-1225. It suffices to say that after careful consideration of all the factors to which we have just referred, both singularly and collectively, we are convinced that in enacting the probate code the legislature evidenced a definite intent to grant greater power and authority to probate courts than it had theretofore conferred upon them under the provisions of 76-1225, *supra*, in cases where notices were received from state hospitals to the effect that persons committed thereto had been discharged *from such hospitals as restored to capacity.* Indeed, to hold otherwise would result in failing to give force and effect to the legislature's intent, clearly and unequivocally expressed, in 59-301[6], *supra*. Moreover, it would completely disregard its obvious purpose in repealing 76-1225, *supra*, and in leaving out of the new code entirely the particular provisions of that section to which reference has been made in the preceding paragraph, and elsewhere in this opinion.

Therefore, applying the established rules to which we have heretofore referred, we feel impelled to hold that, when interpreted on the basis of intent of the legislature in enacting it G. S. 1949, 59-2276, is to be construed as providing that when a notice is received from a superintendent of a state hospital by the probate court of the patient's residence, that a patient has been discharged from such hospital as restored to capacity, such probate court shall make an order to the effect such patient has been restored to capacity from the standpoint of the purposes for which he was committed, *i. e.,* restraint of his liberty under the terms of the commitment. With 59-2276, *supra*, construed as just indicated appellant's claims it attempts to convey judicial function or power to an administrative board or individual and is therefore an encroachment upon judicial power and also violates the due process clause of the constitution of the United States, lack merit and we so hold. It follows that

portion of the trial court's judgment holding that such section is not unconstitutional must be affirmed.

In reaching the conclusion just announced we have not overlooked contentions advanced by appellee to the effect that *In re Estate of Correll*, 178 Kan. 618, 290 P. 2d 1050, supports its position 59-2276, *supra*, is constitutional and contentions made by appellant to the effect that *Sands v. Donge*, 181 Kan. 325, 311 P. 2d 321, supports a contrary conclusion. The fundamental weakness in all arguments presented by the parties is that the constitutionality of such statute was not involved in either case, hence both cases are clearly distinguishable and cannot be regarded as precedents controlling a decision of that question. The *Correll* case is further distinguishable because it was decided on the proposition a son, who had been committed to a state hospital as insane and thereafter discharged from that institution as restored to capacity, was not precluded from sharing in the distribution of his father's estate, under the provisions of the father's will, providing that if the son be discharged from the state hospital as cured he should be entitled to property bequeathed and devised to him under the terms of that instrument. In that case, and properly so, we held that the word "*cured*" as used in the will is synonymous with "restored," therefore, since the son had been discharged from the hospital as restored, he took under the terms of the will. The *Donge* decision also discloses other distinguishing features. In that case two members of the bar brought an action in habeas corpus in district court on behalf of Cordelia E. Davis, who had been adjudged incompetent in a proceeding in probate court where a guardian was appointed for her person and estate without committing her to a state hospital for the insane, alleging she was illegally restrained of her liberty by one of her daughters, who was holding her in custody by virtue of the alleged authority of her guardian. We held, and correctly so, that under such circumstances, and others set forth in the opinion, the petition for a writ of habeas corpus failed to state a cause of action of illegal restraint on behalf of the petitioner and that under all of the circumstances the relief sought on her behalf could only be obtained by a proceeding in the probate court under the provisions of G. S. 1949, 59-2268. What is said and held in the *Correll* and *Donge* decisions has application to the respective factual situations there involved and is not to be construed as contrary to the conclusions here announced with respect to the constitutionality of 59-2276, *supra*.

Finally appellant contends that no authority has ever been delegated to the superintendent of the state hospital at Larned under any regulation adopted by the state department of social welfare, all as required by 59-2007, *supra,* and that as a result of such failure any letters or notices of discharge signed by the superintendent are a nullity and have no force and effect and any order issued by the court under such notice is likewise void.

The short and simple answer to all arguments advanced by appellant on this point, all of which relate to the obligation of the state department of social welfare to file rules and regulations made by that agency with the Revisor of Statutes, under the provisions of Chapter 77, Article 4, G. S. 1949, appear in the provisions of 59-2276, *supra.* In that section the legislature has specified, in clear and unequivocal language, that the order to be made by the probate court under its provisions shall be made by that tribunal "when notice is received from a superintendent of a state hospital by the court of the patient's residence that a patient has been discharged as restored to capacity." It is conceded such a letter was received by the probate court from the superintendent in the case in question and legislative intent that such tribunal should take action upon its receipt cannot be denied. Therefore appellant's position on the point now under consideration cannot be upheld. The rule, that it is not the province of courts to determine the wisdom of legislative policy, is well-established. (See, *e. g., Clifford v. Eacrett,* 163 Kan. 471, 477, 183 P. 2d 861; *Denton v. West,* 156 Kan. 186, 190, 131 P. 2d 886; *State v. Momb,* 154 Kan. 435, 441, 119 P. 2d 544; *Hunt v. Eddy,* 150 Kan. 1, 4, 90 P. 2d 747.)

In view of the conclusions heretofore announced it should now be stated that, where—as here—a guardian has been appointed for the person and estate of a person committed to a state hospital as insane, 59-2276, *supra,* is not to be construed as authorizing or empowering the probate court to set aside or otherwise disturb the existing guardianship in making the restoration order required by its terms. It may also be said that this construction finds support in well-recognized legal treatises.

See 44 C. J. S., Insane Persons, p. 174 § 72, which reads:

". . . The discharge as sane of a patient from a hospital for the insane does not establish that the patient is mentally competent to handle his affairs; and, as considered supra § 56, the discharge of a ward does not vacate a guardianship . . ."

See, also, 29 Am. Jur., Insane Persons, p. 176 § 50, where it is said:

". . . Whatever capacity to sue is lost by one, upon being found insane and being committed to a public asylum, is restored, it has been held, upon his discharge from the asylum, if he is not under guardianship. The discharge of the ward from a hospital for the insane does not vacate the guardianship."

For decisions from foreign jurisdictions, supporting the conclusions announced in the foregoing legal treatises, see *Hatton v. Board of Control*, 146 Tex. 160, 204 S. W. 2d 390; *In re Pfeiffer*, 10 Wash. 2d 703, 118 P. 2d 158; *Reno v. Love et al.*, 25 Ohio Cir. Ct. (n. s.) 129; *In re Chason*, 293 N. Y. S. 972, 162 Misc. 539; *Kellogg v. Cochran*, 87 Cal. 192, 25 Pac. 677.

Since the power and authority of the probate court to make the involved restoration order, under the provisions of 59-2276, *supra*, is limited, as herein previously indicated, all questions pertaining to guardianship are still within the jurisdiction of the probate court. It follows that tribunal, under existing provisions of the probate code relating to the appointment and removal of guardians for incompetent persons, may in another proceeding hold hearings and make such proper orders as may be necessary or required under the facts and circumstances there presented.

What has been heretofore stated and held compels an over-all conclusion that the trial court's judgment was not erroneous and should be upheld.

Therefore such judgment is affirmed.