114   667<br>126   25

[No. 16619.   In Bank.—November 5, 1896.]

MATTHIAS RIDER, RESPONDENT, *v.* JAMES REGAN ET AL., DEFENDANTS.  EDWARD KELLY, AN INSANE PERSON, BY HIS GUARDIAN AD LITEM, APPELLANT.

CONSTITUTIONAL LAW—ACT AUTHORIZING SALE OF HOMESTEAD UPON INSANITY OF SPOUSE—COMMUNITY PROPERTY.—The act of March 25, 1875, providing for a judicial proceeding to authorize the sale of the homestead, upon the insanity of either spouse, by the sane spouse alone,

is constitutional and valid, in so far as it relates to a homestead upon the community property, acquired subsequent to the passage of the act.

ID.—INSANITY OF HUSBAND—SALE AUTHORIZED BY WIFE—BARGAIN AND SALE DEED—WANT OF CONSIDERATION—PROTECTION OF BONA FIDE MORTGAGE.—Where, upon the insanity of the husband, the wife was authorized by order of court duly made to sell the homestead, and a bargain and sale deed was made by her to her brother, without consideration in fact, a mortgage executed by the brother to a *bona fide* mortgagee, without notice actual or constructive of the want of consideration, is valid, and will be enforced as against the insane husband, though the wife was not authorized by the order of court to mortgage the homestead.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. J. M. SEAWELL, Judge.

The facts are stated in the opinion.

*Stafford & Stafford,* for Appellant.

The act of the legislature passed March 25, 1874, is unconstitutional and void. (*Brenham* v. *Story,* 39 Cal. 179; Cooley's Constitutional Limitations, 122, 123, 435; *Jones* v. *Perry,* 10 Yerg. 59; 30 Am. Dec. 430; Kneass' Appeal, 31 Pa. St. 87; *Rice* v. *Parkman,* 16 Mass. 326; *Sohier* v. *Massachusetts etc. Hosp.,* 3 Cush. 491; *Dentzel* v. *Waldie,* 30 Cal. 145; *Sherman* v. *Buick,* 32 Cal. 249; 91 Am. Dec. 577; *Cohen* v. *Wright,* 22 Cal. 293; *Taylor* v. *Porter,* 4 Hill, 143; 40 Am. Dec. 274; *Lies* v. *De Diablear,* 12 Cal. 331; *Desnoyer* v. *Jordan,* 27 Minn. 295; *Dewey* v. *Lambier,* 7 Cal. 347; *Greer* v. *Blanchar,* 40 Cal. 194.)

*Reddy, Campbell & Metson,* for Respondent.

The act in question was constitutional. It falls within what is known as remedial legislation, and it was an exercise by the legislature of its authority as *parens patriæ.* (Cooley's Constitutional Limitations, 118–21, 123; *Hoyt* v. *Sprague,* 103 U. S. 633–35; *Florentine* v. *Barton,* 2 Wall. 210; *Clarke* v. *Van Surlay,* 15 Wend. 436; *Suydam* v. *Williamson,* 24 How. 427; *Williamson* v. *Suydam,* 6 Wall. 723; *Holman* v. *Bank of Norfolk,* 12 Ala. 369; *Cary* v. *Tice,* 6 Cal. 630; *Barber* v. *Babel,* 36 Cal. 15; *Burkett* v. *Burkett,* 78 Cal. 310–12; 12 Am. St. Rep. 58; *Porter* v.

*Bucher,* 98 Cal. 454–61; *Gagliardo* v. *Dumont,* 54 Cal.
498, 499; *Flege* v. *Garvey,* 47 Cal. 371; *Wright* v. *Hays,*
10 Tex. 130; 60 Am. Dec. 200; *Forbes* v. *Moore,* 32 Tex.
196.)

VANCLIEF, C.—Action to foreclose a mortgage executed
by defendant Regan to secure payment of his promis-
sory note, made payable to plaintiff or order, for the
sum of fifteen hundred dollars, with interest thereon at
the rate of eight per cent per annum.

The defendants, Edward and Mary Kelly, are husband
and wife, and were made parties defendant, on the
ground that they claimed some interest in or lien upon
the mortgaged premises, which consist of a lot of land
thirty-five by eighty feet, with appurtenances, situated
in the city of San Francisco.

Edward Kelly alone, by his guardian *ad litem* (he be-
ing insane), answered plaintiff's complaint, denying
that defendant Regan ever owned or had any authority
to mortgage the lot, and alleging that, at the time the
mortgage was executed, he (Kelly) was, and ever since
had been, sole owner of the mortgaged premises. He
also filed a cross-complaint, the substance of which is:
That in October, 1887, while he and defendant Mary C.
Kelly were husband and wife, he purchased the mort-
gaged lot with money earned by him during the mar-
riage, and that it thereby became community property
of himself and wife; that in June, 1880, while he with
his wife and family were residing on said lot, she, in due
form, made and recorded a declaration of homestead
thereon which was never abandoned; that in August,
1884, he, after due examination before the superior
court, was found to be insane, and by order of said
court was committed to the insane asylum at Napa,
California, and is now and ever since has been confined
in said asylum, and during all that time has been and
is now hopelessly insane, and incompetent to transact
any business. These facts alleged in the cross-com-

plaint were found by the court to be true, and are not questioned.

The following additional facts appear by the record, and are undisputed:

In October, 1883, while defendant Edward Kelly was sane, he and his wife executed a mortgage on said homestead lot to secure their promissory note for six hundred dollars, payable to the German Savings and Loan Society one year after date. In October, 1888, suit was commenced to foreclose this mortgage, and while it was pending, to wit, in December, 1888, the defendant, Mary C. Kelly, filed in the superior court her petition praying for an order authorizing her to sell said homestead premises pursuant to an act of the legislature, entitled, "An act to enable certain parties therein named to alienate or encumber homesteads," approved March 23, 1874. (Stats. 1873–74, p. 582.) It is admitted that her petition stated all the requisite facts, according to said act, and among them that neither said Edward nor Mary C. Kelly had any means, property, or estate, except said homestead premises and a few articles of household, furniture, and wearing apparel; that said Mary was dependent for the support of herself and three minor female children, offspring of the marriage, upon the assistance of her relatives; and that her husband had no relatives in this state, except said female children. Notice of the application was published, and also personally served on the public administrator as required by the second section of the act; and the public administrator appeared by counsel for Edward Kelly. After hearing, the court made an order authorizing the petitioner to sell the homestead premises. Thereafter, on April 11, 1889, Mary C. Kelly, by deed of grant, bargain, and sale, conveyed said homestead to the defendant, James C. Regan, who, on May 4, 1889, executed to plaintiff the mortgage to foreclose which this action was brought.

The court below found that on May 4, 1889, when the mortgage in suit was executed, the defendant, Edward Kelly, "had no right, title, or interest in, or claim to,"

the mortgaged premises; and decreed a foreclosure of the mortgage as prayed for in plaintiff's complaint.

The defendant, Edward Kelly, by his guardian *ad litem*, appeals from the judgment and from an order denying his motion for a new trial.

1. It is admitted by counsel for appellant that all the proceedings by which the order purporting to authorize Mary C. Kelly to sell the homestead were regular and in strict accordance with said act of March 25, 1874. But he contends that said act is unconstitutional and void, for the reason that a sale of a homestead in accordance therewith deprives the insane spouse of a vested right to property without his consent and without due process of law. And whether it does so or not is the principal question for decision.

The legislature has not, by the act in question, encroached upon the judicial department. It has adjudged nothing. The act itself does not directly deprive the insane spouse of any right. It merely declares that, upon a specified state of facts to be found by a court, such court may authorize the sane spouse to sell the homestead property. The first section of the act is as follows:

"SECTION 1. In case of a homestead, if either the husband or wife shall become hopelessly insane, upon application of the husband or wife, not insane, to the probate court of the county in which said homestead is situated, and upon due proof of such insanity, the court may make an order permitting the husband or wife, not insane, to sell and convey or mortgage such homestead."

The second section provides that notice of the application shall be published for three weeks in a newspaper, and personally served on the nearest male relative of the insane spouse to be found in the state, or, if no male relative be known to reside in the state, then upon the public administrator, three weeks prior to the application, whose duty it shall be "to appear in court and see that such application is made in good faith, and that the proceedings thereon are fairly conducted."

The third section indicates generally what the verified petition of the applicant shall contain, besides requiring that it specifically set forth the age of the insane, the number, age, and sex of the children of such insane husband or wife, a description of the homestead and the value of the same, and such other facts as relate "to the circumstances and necessities of the applicant and his or her family as he or she may rely upon in support of the petition."

The fourth section provides that, if the court make the order, any sale, conveyance, or mortgage made in pursuance thereof shall be as valid and effectual as if the property thereby affected was the absolute property of the person making such sale, conveyance, or mortgage.

The fifth section provides that a fee not exceeding twenty dollars be paid the public administrator for his services in any case under the act.

The sixth section expressly repeals all acts and parts of acts in conflict with this act.

Conceding that the insane husband had a vested property right in the homestead premises, and even that it extended to absolute ownership thereof (which is not admitted), yet "all vested property rights are held subject to the laws for the enforcement of public duties and private contracts, and for the punishment of wrongs; and, if they become divested through the operation of those laws, it is only by way of enforcing the obligations of justice and good order." (Cooley's Constitutional Limitations, 6th ed., 438.)   The statute in question is a general remedial law intended to enforce the legal obligation of a hopelessly insane husband or wife to apply his or her property, in case of necessity, to the support of the sane wife or husband and their minor children; and, therefore, is no more objectionable on constitutional grounds than would be a statute to enforce the performance of any other private or public duty or obligation. After stating the rule that private property cannot, by either a general or special enactment, be taken from one person and transferred to another for the private use

and benefit of such other person, Judge Cooley says: "Nevertheless, in many cases, and many ways, remedial legislation may affect the control and disposition of property, and, in some cases, may change the nature of rights, give remedies where none existed before, and even divest legal titles in favor of substantial equities where the legal and equitable rights do not chance to concur in the same persons." (Cooley's Constitutional Limitations, 436.)

Nor can it be truly said that the procedure prescribed by the act in question is not due process of law. The usual and only practical kind of notice of the wife's petition was given the insane defendant by publication, during a reasonable period of time, and by personal service of like notice on a public officer who, *pro hoc vice*, was constituted guardian *ad litem* of the insane defendant, and upon whom was imposed the duty of appearing for and protecting the rights of his ward; and who, in this case, did appear for him by counsel. The cause was heard and the facts found by the court before judgment was pronounced, and it is not questioned that the facts proved and found justify the judgment as tested by the provisions of the act in question. If this was not due process of law in the constitutional sense, it would seem difficult, if not impossible, for the legislature to provide due process by which the property rights of an insane person could be affected in any case. The insane defendant is afforded all possible opportunity to be heard in defense of his rights. In addition to the guardian *ad litem* provided by the act, the court, at request of appellant's wife, appointed the learned counsel for appellant to that office, who appears to have ably and zealously performed the duties thereof, both in the court below and in this court.

2. The act is further objected to on the ground that it does not require of the sane spouse any bond or other security for the proper application of the proceeds of the sale. But this objection does not touch the question as to due process of law. It goes only to the quality

or nature of the relief which necessarily follows the
process, whether that process was or was not due pro-
cess of law; and, conceding that the relief provided was
defective or excessive, yet the legislature had indubit-
able power to authorize the courts to grant it *by due
process of law.* It follows that, from the mere nature
of the relief granted, no inference can be drawn touch-
ing the nature of the procedure or process of law lead-
ing up to it. Whether such procedure was due process
of law must be determined by other means. And it
having been hereinabove determined that the procedure
provided by the act is due process of law, and it appear-
ing, and being admitted, that both the procedure and
the relief granted were in strict accordance with the
provisions of the act, it follows that the order granting
such relief was valid.

3. It appears that the defendant, Regan, to whom
the homestead premises were sold, was a brother of the
defendant, Mary C. Kelly, who sold it; that her deed to
Regan recited the consideration therefor to have been
five dollars, which was not paid; that Regan mortgaged
the property to plaintiff to secure a loan of fifteen hun-
dred dollars which he borrowed from plaintiff; that of
the fifteen hundred dollars so borrowed six hundred
dollars was applied by Mary C. Kelly to the satisfaction
of the aforesaid mortgage executed by her and her hus-
band to the German Savings and Loan Society in Oc-
tober, 1883; that the remainder of the money loaned to
Regan by plaintiff (nine hundred dollars) was given to
Mrs. Kelly, and she loaned it to Regan; and that after-
ward Regan, for the consideration of love and affection,
conveyed the homestead, subject to his mortgage to
plaintiff, to his sister, Mary C. Kelly.

Counsel for appellant contends that the substance of
these transactions was a mortgage of the homestead by
Mrs. Kelly to the plaintiff through the agency of her
brother, and not a sale to her brother according to the
purport of her deed to him; and, therefore, was not au-
thorized by the order of the court, which merely au-

thorized her to sell and not to mortgage the homestead. Conceding all this, the rights of the plaintiff as mortgagee are not thereby affected, unless he had actual or constructive notice of the alleged character of the transactions by and between Regan and Mrs. Kelly. There is nothing tending to prove such constructive notice. The deed from Mrs. Kelly to Regan, as previously recorded, both literally and substantially conformed to the order of the court. It purported an absolute sale to Regan, and nothing of its contents indicated anything different. As to actual notice, it is stated in the bill of exceptions that it was proven that at the time of the execution of the mortgage by Regan, and at the time of the loan of fifteen hundred dollars, "plaintiff had no knowledge of any agreement between the defendants, Regan and Mary C. Kelly, but at all of said times believed defendant Regan was the absolute owner of said property in accordance with the terms of the deed of Mary C. Kelly to him, said Regan."

Whether or not the appellant has suffered injury in consequence of the transactions herein above stated, for which he is entitled to any remedy against others than the respondent, is a question not involved in this appeal.

I think the judgment and order appealed from should be affirmed.

SEARLS, C, and HAYNES C., concurred.

For the reasons given in the foregoing opinion the judgment and order appealed from are affirmed. It is to be observed, however, that the propriety of trying appellant's alleged title in this action was not raised; and this decision must not be taken as authority for trying adverse and paramount titles in an action to foreclose a mortgage.

McFARLAND, J., VAN FLEET, J., GAROUTTE, J.

BEATTY, C. J., concurring.—I concur in the judgment of affirmance.

It is not necessary to decide, or to consider in this case, whether the act of 1874 is constitutional or not, as applied to homesteads created by the sole declaration of one spouse upon separate property of the other.

The case here is of a homestead declared upon community property acquired subsequent to the passage of the act in pursuance of which it was sold. If the legislature has the power (as unquestionably it has) to provide generally for the alienation of community property by the husband alone, and his control of the proceeds of the sale, I can see no reason why it has not the power to provide, in case of the hopeless insanity of the husband, for the alienation by the wife alone of so much of the community property acquired subsequently to the passage of the act as may have been lawfully dedicated as a homestead. So far as the act of 1874 goes beyond this proposition it may be seriously doubted whether it is operative, but I can see no reason to refuse to give it effect in a case not involving any question of vested rights.

HENSHAW, J., dissenting.—I dissent, under the conviction that the act in question is unconstitutional. Section 1 of that act is as follows: "In case of a homestead, if either the husband or the wife shall become hopelessly insane, upon application of the husband or wife not insane to the probate court of the county in which said homestead is situated, and upon due proof of such insanity, the court may make an order permitting the husband or wife not insane to sell or convey or mortgage such homestead."

Section 2 provides for publication and service of notice of the application.

Section 3 makes necessary the filing of a petition, and prescribes what it shall contain.

Section 4 declares that if the court shall make the order contemplated by section 1, the same shall be entered upon the minutes, and thereafter any sale, conveyance, or mortgage made in pursuance of such order

shall be as valid and effectual as if the property affected thereby was the absolute property of the person making such sale, conveyance, or mortgage in fee simple.

It is first to be noted that the statute is applicable, not to any particular class or kind of homesteads, but to all homesteads, whether declared upon community property, or upon the separate property of one or other of the spouses—whether declared by their joint act, or by the act of either. While the homestead exemption is only to the amount of five thousand dollars, yet real property of any value may be impressed with the homestead character, and when so impressed, that character attaches to all of the property. Thus a homestead may be declared upon the separate property of the wife of the value of forty thousand or fifty thousand dollars. Should the wife become hopelessly insane, that homestead, at the instigation of the husband, could be subjected to sale.

Next, it is to be observed that the authority to order the sale is not made to depend upon a determined need or advisability therefor. No question of the necessity of the support of the sane or insane spouse, or of minor children, or other dependent persons, is necessarily involved. The bald fact that one party to a marriage has become hopelessly insane, and that there is a homestead, whether upon community property or upon the separate property of the insane spouse, is all that is necessary to warrant the order of sale.

Again, it is to be seen that the act makes absolutely no provision for distribution or disposition of the funds arising from the sale. The power of the court ceases when, by its order, it authorizes the sale to be made. The interest of the insane person is in no way protected. Neither the money received, nor any part of it, is required to be devoted to his support, or to the support of any person dependent upon him. The result might be, as in this case it was, that the property of the insane owner was sold, and the moneys turned over to a third person who had not the slightest legal claim upon him or it.

There are yet other matters in which this act is at least peculiar. Not only does it authorize the sale of the land of an insane person, without protecting his interests in the proceeds of the sale, but it fails even to provide. for the appearance of a guardian. The proceedings are begun and the sale made by a person standing in no fiduciary relation to him. There is no supervision by the court of the sale, no bond is exacted of the seller. The sale may be a gift, as in fact this was, or the price may be entirely inadequate. Yet no one is empowered to check any fraud which may be committed upon the unfortunate owner. He is stripped of his property without a hearing and without redress, because, having a homestead, he has become insane.

There is a species of legislation to which Judge Cooley has given the name "prerogative remedial legislation," that is not obnoxious to the law. It is based upon the recognized power of the legislature, as *parens patriæ*, to pass proper rules and regulations for superintendence, disposition, and management of the property of infants, lunatics, and others under disability. Within the legitimate scope of such legislation is the power which may be conferred upon one standing in a fiduciary relation to a minor or incompetent, to change the character of the estate, and even to dispose of its proceeds, when it is to the interest of the minor or incompetent that such should be done. But in all such legislation there is no determination of adversary rights, no deprivation of any person of his property. Says Judge Cooley: "This species of legislation may perhaps be properly called prerogative remedial legislation. It hears and determines no rights. It deprives no one of his property. It simply authorizes one's real estate to be turned into personal." (Cooley on Constitutional Limitations, 122.) In *Paty* v. *Smith*, 50 Cal. 153, this court gravely doubted the power of the legislature to direct a sale of the real estate of an infant by one other than a duly appointed guardian. That act provided, however, that the person making the sale should account for the proceeds to the

probate court, and this court assumed that the statute contemplated the appointment of that person as guardian by the probate court.  In *Brenham* v. *Davidson*, 51 Cal. 352, the act under consideration authorized the guardian of an infant to sell the real estate, subject to the approval of the probate court, for the purpose of enabling the guardian to reinvest the proceeds in other property for the benefit of the ward.  It was declared that such an act was not an assumption of judicial power by the legislature, and this court quoted with approval the language of Judge Cooley to the following effect: "The rule upon this subject, as we deduce it from the authorities, seems to be this: 'If the party standing in position of trustee applies for permission to make the sale, for a purpose apparently for the interest of the *cestui que trust*, and there are no adverse interests to be considered and adjudicated, the case is not one which requires judicial action; but it is optional with the legislature to grant the writ by statute, or to refer the case to the courts for consideration, accordingly as one course or the other, on consideration of policy, may seem desirable.' "

But in these cases, and in the many others which we have examined from sister states, the acts have been upheld because it was apparent from them that the interest of the minor or incompetent was fully protected, and that the statutes were in their operation beneficent. Thus, in *Rice* v. *Parkman*, 16 Mass. 326, the court says: "The only object of the authority granted by the legislature was to transmute real into personal estate for purposes beneficial to all who were interested therein. . . . . No one imagines that under this general authority the legislature could deprive a citizen of his estate."

Authorities need not be multiplied upon so plain a proposition.  We are here confronted with an act entirely different in character, an act which assumes to authorize one not standing in a fiduciary relation to the incompetent to make a sale of his real estate for purposes not connected with the incompetent's interest, neces-

sities, or convenience, and without making any provision to secure to him his just share of the proceeds of the sale.

We are not in this concerned with a definition of the particular character of the wife's interest in a homestead declared upon the community property. Whether that interest amounts to an estate, or whether it be a mere expectancy, it is unquestionably true that the husband, in whom is vested the sole right of control and disposition of the community property, has a legal interest therein. This legal estate has a money value. When a sale of the homestead is made it involves a sale of an estate in realty belonging to him. By the act under consideration he is neither secured in that property, nor is it devoted of necessity to any legitimate purposes. Our attention has not been directed to the decisions of any courts in which an act like this has been construed and upheld, nor would we, against the great weight of reason and authority, be inclined to follow them if any such could be found.

Respondent, it is true, makes reference to the case of *Forbes* v. *Moore*, 32 Tex. 195. It is there said: "During the insanity of the husband the wife is the head of the family, and, as such head, has the legal right to dispose of so much of the common property of husband and wife, or, in case there be none, of the separate property of the husband, as may be necessary to supply the wants of herself and his or her children." But in the later case of *Heidenheimer* v. *Thomas*, 63 Tex. 287, this language is considered, and it is said that, in so far as it seems to indicate a rule different from the true one, it must be regarded as *obiter*, and of no binding force. And in *Texas etc. Ry. Co.* v. *Bailey*, 83 Tex. 19, the court quotes with approval the language of *Heidenheimer* v. *Thomas, supra:* " We are of the opinion that no such power rests in the wife of an insane person, at least in reference to community property or the separate property of the husband. The law provides for just such a

case, and renders unnecessary the exercise of any such power by the wife."

We are not here called upon to say whether or not the legislature has the power to accomplish what seems to have been the principal purpose of this act, namely, to subject the community property or the separate property of an insane spouse to the support of those legally dependent upon him. It is enough to say that the attempt which finds expression in an act such as this is inadequate, improper, and unconstitutional, and amounts to but the confiscation of the property of a person without provision for the distribution of that property, and for no other reason assigned than that he has met with the most lamentable misfortune of becoming hopelessly insane.

The judgment and order should be reversed, and the cause remanded.

TEMPLE, J., and HARRISON, J., concurred in the dissenting opinion.

Rehearing denied.