No. 35,329

CARSON STARKE, *Appellee*, v. MYRTLE E. STARKE, an Insane Person, by FRANK A. MOSES, Her Guardian, *Appellant*, et al. (CONTINENTAL OIL COMPANY, *Appellee*.)

(125 P. 2d 738)

Opinion filed May 9, 1942.

*Tudor W. Hampton,* of Great Bend, argued the cause for the appellant.

*Fred L. Conner,* of Great Bend, and *Howard Davis,* of Ponca City, Okla., argued the cause, and *Wm. Osmond* and *T. B. Kelley,* both of Great Bend, and *Wm. H. Zwick,* of Ponca City, Okla., were on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: In an action brought in district court the husband of an insane wife sought authority for execution of an oil and gas lease on land owned by her and held as their homestead. Judgment was entered for the plaintiff, and under order of the court, a trustee, appointed for the purpose, joined the husband, on behalf of the incompetent wife, in the execution of the lease. A motion to vacate the judgment was overruled and this appeal followed.

On February 4, 1942, an opinion *per curiam* by this court was filed reversing the judgment on the ground that the district court had no jurisdiction and stating that a formal opinion would follow later. (*Starke v. Starke,* ante, p. 1).

The motion to vacate alleged that the judgment was void for two reasons:

1. The court was without jurisdiction of the subject matter.

2. The judgment was in violation of article 15, section 9 of the Kansas constitution, the pertinent provisions of which are:

"A homestead . . . shall not be alienated without the joint consent of husband and wife, when that relationship exists. . . ."

Insofar as it is necessary to notice, the petition filed at the inception of the action alleged that the defendant, Myrtle E. Starke, acquired title to a tract of about 145 acres in Barton county in 1923, and immediately subsequent to its acquisition she and her husband, the plaintiff herein, established their residence thereon, and that at all times since it has been their homestead; that Myrtle E. Starke and the plaintiff were married on November 8, 1908, and have at all times since been husband and wife; that they are the parents of three children, one of whom is a minor, and that their daughter has two children, both of whom are minors, and that no guardian has been appointed for either of said minors; that in February, 1929, Myrtle E. Starke was found to be insane and was committed to a state hospital of which she has ever since been an inmate; and that on January 3, 1941, the defendant, Frank A. Moses, was appointed guardian of the estate of Myrtle E. Starke by the probate court of Barton county, Kansas.

The petition further alleged that the above-described real estate has some indication of being valuable for oil and gas purposes; that wells are being drilled in the vicinity and as a result of any development it is possible that oil from the lands of Myrtle E. Starke and those persons who may ultimately become the owners of the land by inheritance may be drained away; that the estate of Myrtle E. Starke is not financially able to explore the land for oil and gas and it is to the best interests of her estate that the lands be leased for that purpose; that such lease will not be in contravention of the terms of any will or deed and will produce a revenue that could not otherwise be obtained and would protect the land from drainage and waste; that under the constitution of Kansas a homestead may not be alienated without the joint consent of husband and wife when that relation exists, and that the supreme court has construed the above provision as preventing probate courts from authorizing the guardian of an insane person to join with the spouse of such insane person in the execution of conveyances or encumbrances against the homestead of such an insane person, and that by reason of this limitation upon the power and authority of probate courts it is impossible for the plaintiff or the guardian of Myrtle E. Starke, or both, or anyone else, to lease the land for oil and gas purposes, and that in view of the foregoing, although Myrtle E. Starke is entitled to the oil and gas underlying her land, she has no way or means of obtaining the benefit thereof and has no adequate remedy at law in order to enforce her rights thereto.

The petition further alleged that plaintiff, as husband of Myrtle E. Starke, is legally liable for her support and is interested in seeing that her property is managed in such manner as to produce an income which may be used for her benefit; that he has a homestead interest in the real estate, and for these reasons is justified in bringing this action, and that he brings the action against the defendants not only in their individual capacities but as representatives of all that class of persons born or unborn who may become owners of the real estate or any portion thereof by reason of becoming heirs at law of Myrtle E. Starke in case of her death; that Myrtle E. Starke has not executed a valid will and probably never will be able to make a will; that the action is brought for the express purpose of procuring the appointment of some person as trustee, for and on behalf of Myrtle E. Starke and all others who in the future may be-

come interested in said real estate by reason of becoming the heirs at law or the devisees of Myrtle E. Starke in case of her death, to execute an oil and gas lease for the purpose of developing and producing minerals from the real estate in order that the interest of Myrtle E. Starke and her successors in interest may be saved and preserved.

The petition further alleged that neither the said Myrtle E. Starke nor any of the other parties to the action have an adequate remedy at law by which to assert their rights or to obtain the relief sought.

The prayer of the petition was for the appointment of a trustee with power to make an oil and gas lease.

The persons named as defendants were the guardian of Myrtle E. Starke and the children and grandchildren, individually and as representatives of that class of persons born or unborn who may become heirs or devisees of said Myrtle E. Starke in case of her death, as well also an oil company to which reference will later be made. A guardian *ad litem* was appointed for the defendant, Myrtle E. Starke, and a guardian *ad litem* for the named minor defendants, each of whom filed answers.

Thereafter, a trial was had and the court found the facts in substantial conformity to the allegations of the petition, and on March 4, 1941, appointed the plaintiff as a trustee with power to execute an oil and gas lease in accordance with the court's order, the details of which need not be noticed.

On March 7, 1941, the trustee filed a report of his proceedings and submitted an oil and gas lease to the Continental Oil Company for approval, which report and lease the court approved.

The motion to vacate was filed on March 9, 1941, by the guardian and guardian *ad litem,* who here appeal from an order overruling the motion.

Before considering the question of jurisdiction raised by appellants, we note a contention made by appellee that the motion to vacate the orders for the lease came too late. This contention assumes that the orders were either valid or merely voidable. The assumption is untenable. If the court had no jurisdiction of the subject matter, the orders were void rather than voidable and could be vacated at any time. (G. S. 1935, 60-3009; 31 Am. Jur. 71, § 408; 33 C. J. 1075, § 36; *In re Windell,* 152 Kan. 776, 778, 107 P. 2d 708; *Taylor v. Focks Drilling & Mfg. Corp.,* 144 Kan. 626, 62 P. 2d 903;

*Baker v. Kansas City, Mo.,* 118 Kan. 27, 28, 233 Pac. 1012; *Kelso v. Norton,* 74 Kan. 442, 87 Pac. 184.)

We consider now the question of jurisdiction. A guardian of Myrtle E. Starke's estate had previously been appointed by the probate court. It was the guardian's duty to look after her interests. Certainly the situation resulting from oil development in the vicinity of her land called for his attention. But instead of proceeding in the probate court, whether by the husband or by the guardian, to secure approval of the lease, relief was sought in the district court through a trustee appointed for the purpose.

The power of probate courts to deal with the property of insane persons roots in the constitution of the state. Article 3, section 8 of the constitution provides that "There shall be a probate court in each county, which shall be a court of record, and have such probate jurisdiction and care of estates of deceased persons, minors, and persons of unsound minds, as may be prescribed by law." While the jurisdiction of the probate courts is limited (except possibly as to certain inherent powers [see *In re Hanson,* 80 Kan. 783, 105 Pac. 694; 21 C. J. S. 538, § 301]) to such powers as are conferred upon it by statute, it has very broad powers over the estates of insane persons (*Foran v. Healy,* 73 Kan. 633, 640, 642, 85 Pac. 751, 86 Pac. 470; *Hill v. Honeywell,* 65 Kan. 349, 351, 69 Pac. 334). These broad powers have been further broadened by the provisions of the present probate code which became effective July 1, 1939 (G. S. 1939 Supp. 59-1a01 *et seq.*). In paragraph (6) of 59-301 of the new code it is provided that probate courts shall have power "to appoint and remove guardians for minors and incompetent persons, to *make all necessary orders relating to their estates,*" etc. (Italics supplied.) The new code specifically provided in paragraph (12), section 59-301, that probate courts "shall have and exercise such *equitable powers* as may be necessary and proper fully to hear and determine any matter properly before such courts." (Italics supplied.) Furthermore, the new probate code contains a number of specific provisions (G. S. 1941 Supp. 59-1806; 59-1807; 59-1808; 59-1809) relative to the power of guardians, subject to approval by the court, to sell, lease or mortgage the property of their wards. (The broad powers conferred in the new probate code over estates of *decedents* was considered in the recent case of *Foss v. Miles,* ante, p. 262, 124 P. 2d 438, and in *Dixon v. Fluker,* post, p. 399, 125 P. 2d 364, this day decided.)

While the delegation, by the constitution, to probate courts of probate jurisdiction and care over the estates of insane persons does not prevent the legislature from also conferring upon district courts certain original jurisdiction to deal with the same subject matter (21 C. J. S. 731, § 488, note 4; *Hill v. Honeywell*, 65 Kan. 349, 351, 69 Pac. 334), the legislature has not clothed district courts with the power it assumed to exercise in the instant case. Certainly if *any* court had jurisdiction to take the action here sought, it was the probate court. The conclusion that the district court was without jurisdiction is further fortified by the well-established rule that even where there is concurrent jurisdiction, the court which first acquires jurisdiction ordinarily retains it to the exclusion of another court which seeks to assume it. (21 C. J. S. 745, § 492; 14 Am. Jur. 435, § 243; *Proctor v. Dicklow*, 57 Kan. 119, 126, 45 Pac. 86; *Watts v. Watts*, 151 Kan. 125, syl. ¶ 2, 98 P. 2d 125.)

The conclusion reached on the question of jurisdiction requires reversal of the judgment. It is therefore unnecessary to pass upon the constitutional question and we think inadvisable to do so in this case.

The judgment is reversed with directions to dismiss the action.

Hoch, J. (concurring in result; dissenting from certain conclusions stated in the opinion): I concur in the finding that the district court was without jurisdiction of the subject matter and in that part of the opinion pertinent thereto. But in view of the whole situation disclosed by the record and as presented by this appeal, I think the court should also have treated the constitutional question raised by the motion to vacate the judgment.

While the general policy of deciding only what is strictly necessary to determine the result of a case is a wise one, there have been many cases where the court felt that it was both just and advisable to treat other vital questions which had been briefed, argued and considered but which for some reason had become non-essential in determining the immediate result in the then pending case. In my opinion this case presents such a situation. We have told the appellee that original jurisdiction of the estates of incompetents lies exclusively in the probate court. Perhaps we have now no obligation, strictly speaking, to do more than that for his guidance. But after all, the question which lies at the bottom of this case is the proper construction of the homestead provision involved.

The constitutional question was briefed, argued and considered. Indeed, after the case had been submitted, we reset the case, on our own motion, for oral argument on the constitutional question, as well as on the question of jurisdiction. On account of all that and because, in my opinion, the plight of the appellee, husband of a stricken wife, is so contrary to the protective purposes of the homestead law, I think we should here reëxamine the question of the proper construction of the homestead provision of the constitution. Moreover, the situation of the appellee has an aspect of wide public interest, particularly so on account of the extensive development of oil and gas in this state in recent years. I am therefore impelled to express my personal views on the question.

Three questions inhere in the constitutional provision that the homestead "shall not be *alienated* without the *joint consent* of husband and wife, when that relation exists." (Italics supplied.) First, what constitutes "alienation"; second, when may consent be said to be "joint"; and third, what may constitute "consent"? All three questions have been before this court at various times. The first two call for only brief comment here. The third is the determining one in the instant case.

On the first question it will suffice to say that an oil and gas lease, precisely like the one here involved, has been held by this court to be an "alienation" within the meaning of our constitution. The first case in point was *Land Co. v. Gas Co.*, 43 Kan. 518, 23 Pac. 630. In there holding that an oil and gas lease, given on the homestead without the wife's consent, was invalid, the court adopted the proposition stated in the earlier cases of *Coughlin v. Coughlin*, 26 Kan. 116, and *Pilcher v. A. T. & S. F. Ry. Co.*, 38 Kan. 516, 16 Pac. 945, that any conveyance which may result in *interference with the possession and enjoyment of the premises is* an "alienation" within the meaning of the constitution. Such interference was held mainly to arise, in the case of the oil and gas lease, from the right therein given to erect derricks, buildings, to lay pipe lines, etc., in connection with prospecting and production under the lease. Like provisions are contained in the standard oil and gas lease here involved. (*Land Co. v. Gas Co.*, supra, was followed in *Palmer v. Parish*, 61 Kan. 311, 59 Pac. 640; *Thompson v. Milliken*, 93 Kan. 72, 75, 143 Pac. 430; and *Petersen v. Skidmore*, 108 Kan. 339, 195 Pac. 600. See, also, 45 A. L. R. 424-427.)

On the second question there is no controversy here. The instrument of *alienation* must be *jointly* executed. That is a primary requisite, and in various decisions the meaning of the word "joint" has been explored. (*Ott v. Sprague*, 27 Kan. 620; *Pilcher v. A. T. & S. F. Ry. Co.*, supra; and *Wallace v. Insurance Co.*, 54 Kan. 442, 446, 38 Pac. 489.)

And now, what about the word "consent"? There is no dispute over the formal definition. Consent is an act of agreement made with intelligent understanding of the nature and probable effect of the act. The only issue here is whether the probate court—charged both by the constitution and the statutes with the duty of protecting the interests of incompetent persons—may not substitute its mind for that of the ward, the insane wife, and in her behalf join the sane husband in "consent" to the lease. If not, then no homestead can ever be sold, leased, or mortgaged where a marriage relationship exists and either spouse is mentally incompetent, even though irreparable injury thereby results to both husband and wife. With reference to all other property no one questions the power of the court to "consent" in behalf of an incompetent ward—the exercise of such power and duty is the very heart of guardianship. Why then should the idea of such judicial consent be rejected in the case of the homestead? To do so is to say in one breath that the ward must give his *personal* consent, and in the next that he is *incapable of giving it*. We have examined the decisions to find what basis there is for such a strange doctrine.

The term "joint consent" has been involved in a number of our cases. Most of them are not in point on the present issue. Some of them deal with deeds or mortgages given by the husband or wife *alone,* where title was held in the name of the one seeking to convey. Or, with attempted conveyance by a guardian *without authorization* by the probate court. Others involve *separate* conveyances, held inadequate because there was no *joint* conveyance by husband and wife. But several decisions are clearly in point. They hold that where one spouse is insane, and the other desires to alienate the homestead, either by deed, lease or mortgage, consent on the part of the insane spouse cannot be authorized by the court.

The parent case is *Locke v. Redmond,* 6 Kan. App. 76, 49 Pac. 670, decided by the Court of Appeals and confirmed *per curiam* without written opinion by this court (59 Kan. 773). Strangely

enough, neither in that case nor in any of those which followed it does it appear that the question of what constitutes "consent" within the meaning of the constitution *was ever presented or considered.* In the Redmond case the court had before it for scrutiny a statute (G. S. 1889, 3696-3708) empowering a guardian to sell "the whole or so much of the real estate of an insane person" as might be ordered by the probate court. It was held that the statute was meant to apply only to the estate *other than the homestead,* and the court said:

"We do not believe that it was the intention of the legislature that these provisions should take the place of the 'joint consent' provided by the constitution. . . . When the reason of the wife has been overthrown, when she has become so unfortunate as to be unable to protect herself, when by her efforts to keep the homestead and family together she has been overcome and her mind gives way, it is not an unwise provision of our constitution that she should be protected to the extent of the homestead. That this homestead should be placed *beyond the power of a guardian and beyond the power of her husband, except with her consent,* is wise and just. . . . We hold that it requires the joint consent of husband and wife to alienate the homestead, and that a want of such consent cannot be supplied by a guardian. *If, for the reason of insanity or any other reason, the wife's consent cannot be procured, there can be no conveyance.*" (Italics supplied.) (pp. 81, 82.)

From those statements have largely flowed the subsequent decisions. Two observations, in passing, on those statements: First, the opinion refers only to the power of the *husband* or of the *guardian* and makes no reference to the vital question of the power of the *court* to give consent for her. Second, the opinion states it is a wise provision which places the homestead rights of an insane wife beyond the power of her husband or guardian *"except with her consent,"* and then follows with the observation that being insane she *cannot give her consent!*

The Redmond case was followed by *Withers v. Love,* 72 Kan. 140, 83 Pac. 204, in which a husband, whose wife was insane, was convicted of a felony and upon the day he was sentenced surrendered the guardianship of his wife's estate and gave to his brother-in-law, appointed her guardian by the probate court, power of attorney to manage his affairs, to sell property, etc. The brother-in-law, as guardian, subsequently secured authority from the probate court to sell his ward's interest in the homestead, together with the husband's interest which he sold under the power of attorney. Some years later, after the husband was released from the penitentiary, he

brought action to set aside the guardian's deed, and this court held that the deed was void. The Redmond case was cited in support. A number of other cases were also cited, but none of them involves the instant issue. They referred to matters such as fraud or to conveyances executed under duress, about which there can be no question.

There are perhaps only two later cases which may be regarded as directly in point. In *Iles v. Benedict,* 110 Kan. 200, 203 Pac. 925, a husband and wife had made a contract for the sale of the homestead, upon certain conditions, but before the conditions were met the husband became insane. After securing authority from the probate court, the wife executed a deed for herself and as guardian of her husband's estate. The grantee refused to accept the guardian's deed on the ground of doubtful conveyance of title. Specific performance, sought by the wife, was refused. It must be noted, however, that at the time the deed was at issue and at the time of the decision, the then-existing statute (G. S. 1915, § 6118), which provided for disposition of property of insane married persons, expressly *excepted the homestead* from its scope. That fact alone was sufficient to invalidate the deed, and what was said further in the case might well be regarded as dictum. However, the Redmond case, decided under statutes containing no such reservation, was cited with approval.

Following the decision in the Benedict case in 1922, the 1925 legislature passed an act (Laws of 1925, ch. 181; G. S. 1935, 39-211) which provided that whenever the personal property of an insane person was insufficient to pay debts, the guardian might, after securing authority therefor from the probate court, "sell the whole or so much of the real estate of such person as shall be necessary: *Provided, however,* That if the property sought to be mortgaged, leased or sold shall be the homestead of said incompetent person the court shall not enter any order upon said application unless the husband or wife of said incompetent, as the case may be, shall have first filed with the court a written consent to said application: *And provided further,* That no guardian's deed executed by virtue of such an order shall be valid unless such husband or wife of said incompetent shall join in the deed as one of the grantors therein." In 1927 the legislature further supplemented the 1925 statute by striking from G. S. 1915, § 6118 (R. S. 1923, 39-221), which was in effect when the Benedict case was decided and which had not been repealed by the 1925

act, the phrase "except the homestead" and by adding this provision: "When any such [insane] person is a married woman or married man, and not having the property in her or his own right or name, it shall be lawful for her or his guardian, jointly with the husband or wife of such person, to sell, convey or mortgage any real estate, and such sale, conveyance or mortgage shall be valid when ordered and approved by the probate court, without the proceedings being had required by the provisions of this act." (Laws 1927, ch. 228; G. S. 1935, 39-221.)

The above statutes of 1925 and 1927 (G. S. 1935, 39-211, 39-221) were before this court in the case of *In re Barnell Estate,* 141 Kan. 842, 44 P. 2d 214. Margaret Barnell had been appointed guardian of her husband's estate, who had been adjudged insane in November, 1931. In the preceding January a house in Kansas City had been purchased on an installment plan, in the wife's own name. She and her daughter were occupying it as their home. Finding herself unable to meet the payments, she found it possible to refinance on more favorable terms from another source, and brought action in the probate court as guardian to secure approval of the new mortgage. She followed the procedures both of 39-211 and 39-221. The lower court denied her the right to make the mortgage on the ground that the statutes were unconstitutional because in violation of article 15, section 9 of the constitution. This court affirmed the judgment, basing the decision upon *Iles v. Benedict,* supra, which had been decided when the statutes expressly exempted homesteads of insane persons from its operations.

These decisions have, in effect, read the word "personal" into the constitution before the word "consent" and thereby excluded all possibility of consent by the court in behalf of its incompetent ward. Such a construction not only robs the ward of protection but is contrary to the common practice in many other situations familiar to the law, where the court must and does give consent in behalf of those incapable of personal action. It is also essentially inconsistent with the holding in various other cases involving homestead property. For instance, take the case of division of property of husband and wife under order of the court. I am not referring to cases where divorce is granted—admittedly in such a case a different situation is presented because the marriage relationship has ceased to exist. But this court has approved division of property of husband and wife in which a homestead interest was taken

away from one spouse and given to the other *even though no divorce was granted.* (See *Osman v. Osman,* 86 Kan. 519, 520, 121 Pac. 327.) In *Wulf v. Fitzpatrick,* 124 Kan. 642, 643-644, 261 Pac. 838, the "home farm" held in the name of the husband and upon which he and the plaintiff lived was not specifically called the homestead, but it was clearly such under the facts stated in the opinion. Without a divorce being granted it was transferred to the wife. Certainly in such a case the consent is not *personal* on the part of the spouse whose interest in the homestead is taken away. Other illustrations readily suggest themselves.

In determining what the framers of the constitution meant by the word "consent" it is necessary also to consider article 3, section 8 of the constitution. Under that section the probate court is given "such probate jurisdiction and care of estates of . . . persons of unsound minds . . . as may be prescribed by law." In harmony therewith, very broad powers have been conferred by statute, as heretofore noted. If the word "consent" can mean nothing but *"personal* consent" how could *any* property, whether homestead or not, belonging to a ward, be alienated? Without constructive consent, or in other words, consent imputed as a matter of law, the provisions of constitution and statute for protecting the interests of minors and incompetent persons would be futile. It seems perfectly clear to me, therefore, that the word "consent" must include not only cases where the spouse is capable of giving consent *personally,* but also cases where the spouse is incompetent and consent must be given for him or her by the court having jurisdiction over the ward's estate and charged with the duty of protecting his interests.

It is argued that sanction of the instant lease without the personal consent of the insane wife (which she cannot give) would let down the bars and open the way to a raid upon the homestead exemption, so deeply imbedded in our law and public policy. That suggestion implies unwarranted distrust of the courts and ignores realities. If the probate court cannot be trusted to protect the homestead interest of the state's ward, what shall be said of its plenary power over all other property of incompetents? Suppose, in the instant case, an adjoining quarter section of land is owned by another married woman who does not live upon it but lives in a rented room in town. Suppose the land is all the property she has. Suppose she becomes mentally incompetent. No one questions

or fears the court's power in such a case. Upon proper showing, the probate court can and does authorize the guardian of her estate to sell, lease or mortgage the insane married woman's land. Numberless similar illustrations might be given. The necessity of the exercise of such judicial power has been universally recognized. To say that the probate court may not give such consent, no matter how urgent the need, simply because the property is a homestead, is not only wholly illogical but reads a limitation into the constitution which the framers did not put there.

Let it be perfectly clear that I am not here suggesting that the other spouse or the guardian of the incompetent's estate has any power, without order and approval of the court, to join in the consent to alienation of the homestead. The power is *in the court*. Not only in the section of the probate code, here involved (59-1807), and in other sections is there specific requirement of court approval, but the opening sentence of the section defining a guardian's duties (G. S. 1941 Supp. 59-1804) reads: "A guardian shall be subject to the control and direction of the court at all times and in all things." And court approval can be secured only after petition has been filed as provided in the code and after *"it shall be determined by the court that such sale, lease or mortgage is for the best interests of the ward and his estate."* (Italics supplied.) (59-1807.) And beyond all this lies the right of appellate review in the case of arbitrary action or abuse of discretion.

The construction herein placed upon the word "consent" is the only one consistent with the purpose and spirit of the homestead provision. The obvious purpose was to protect the interests of the homeowner—to throw the protecting arm of the constitution about the institution of the family, and of the home which shelters it. The beneficent effects of that policy have become a part of our state tradition. And I say that the judicial interpretation heretofore placed upon the word "consent" runs directly counter to that benign policy. For illustration, let us pose one more example, human and real, in addition to the instant case. A husband falls victim to insanity said to be of an incurable type. His confinement in an asylum is probably for life. The only property is a Kansas homestead, owned by the wife in her own name. The children live in a distant state and the mother desires to sell the Kansas place to get money to buy a home where she can be near her children in her declining years. Under the rule of *Locke v. Redmond* no court can

give her authority either to sell or lease, no matter what showing is made that it would be to the interest of her husband as well as herself to do so. Apparently her only recourse under our prior decisions, as long as her husband is alive and she desires no divorce, is to live and die alone on the Kansas place, or abandon it to the weeds and to tax sale!

And now what have we in the instant case? A stricken wife and mother is taken from her homestead and her family. The husband, and perhaps the children, continue to live on the homestead—with what struggle and hardship the record does not disclose. But at last new hope is kindled. Near-by lands are dotted with oil-producing wells. The threat of drainage grows real. And it is no imaginary menace. That oil and gas are migratory in character—the distance of travel depending, among other factors, upon the porosity and permeability of the saturated structure—is an accepted fact, a fact not only of scientific interest, but a fact upon which the whole oil and gas industry is built. And so, to protect the homestead property of the insane wife, there must be offsetting wells on the tract. Whatever oil and gas lie beneath it may be lost, irrevocably and wholly. The family is unable to finance development. But oil companies, with resources and equipment, offer to take a production lease, with fair rentals and the usual royalty to the owner. Whereupon, the husband or the guardian of the estate goes confidently to the court that is charged with care of the estate of his wife and lays the situation before it. The court is impressed. It knows that if the stricken wife could speak for herself she would eagerly join her husband in execution of the lease. It desires to act at once to save her from irreparable loss. It adopts every means for guarding her interests—appraisal of the value of the lease, creation of a trust fund in all rentals and royalties, ample bond from the trustee, and continuing jurisdiction to protect her who cannot protect herself. But there stands *Locke v. Redmond,* 6 Kansas Appeals! It says that the wife must give her consent personally, and being insane she cannot do it! And the court can only bow its head and say: "Too bad. We must permit adjacent wells to drain the rich resources of the land—perhaps the main value in the homestead. Let the lawful larceny continue." And this in the name of the constitution which sought to protect those who cannot protect themselves!

I cannot accept the idea that the framers of the constitution in-

tended any results so preposterous. The legislature of 1868, meeting but a few years after the constitution was adopted and having in its membership several men who had sat in the constitutional convention, enacted a comprehensive statute providing for broad control by the probate court, including sale, lease or mortgage of the real estate of incompetents, *without reservation as to the homestead.* One of the sections provided:

"Every conveyance, mortgage, lease and assurance, made under the order of the probate court, pursuant to the provisions of this act, *shall be as valid and effectual as if the same had been executed by such insane person . : .* when of sound memory and understanding." (G. S. 1868, ch. 60, § 32.) (Italics inserted.)

But along came the ill-considered decision in *Locke v. Redmond.* And then followed through the years attempts by the legislature to avoid by statute the gross injustices flowing from that decision and later ones which simply trailed it. (Latest such attempts, Laws 1925, ch. 181; Laws 1927, ch. 228.) As long as the unsound rule of *Locke v. Redmond* is permitted to stand such statutes will continue to be stricken down.

Decisions of other jurisdictions touching the question are in conflict. It is said that the weight of authority is on the side of *Locke v. Redmond.* That may be true, though our research discloses few cases that are really in point, owing to different provisions of law involved. And there are strong and well-considered opinions which support the view herein expressed.

The Texas constitution provides (art. 16, § 50) "nor shall the owner, if a married man, sell the homestead *without the consent* of the wife, given in such manner as may be prescribed by law." (Italics supplied.) In a series of cases the Texas courts have held, in effect, that in case the wife is insane the wife's *personal* consent is not required, but may be imputed to her by the court. While the language of the Texas constitution differs materially from ours, the reasoning of the Texas cases is equally applicable here. In *Green et al. v. Windham et al.,* 115 Tex. 162, 278 S. W. 1101, it was said:

"But neither the constitution nor the statutes contemplated an impossibility; neither was it in contemplation that under impossible conditions the homestead, once acquired, should remain so forever or indefinitely, regardless of the desires or welfare of the parties. Mrs. Jennie Green had become insane and was wholly unable to give consent or to in any manner exercise choice, judgment or discretion. It was not the consent of one wholly incompetent and wholly unable to give consent that was in the contempla-

tion of the makers of the constitution. . . . The law does not prescribe the impossible." (p. 165.)

(See, also, *Reynolds Mortgage Co. v. Gambill*, 115 Tex. 273, 280 S. W. 531; *Carter v. Green*, 64 S. W. 2d 1069; *Brunson et al. v. Yount-Lee Oil Co. et al.*, 32 S. W. 2d 893, 894.)

The California decisions also hold that the court may give consent to alienation in behalf of insane persons. The California law provides that "the homestead of a married person cannot be conveyed or encumbered unless the instrument by which it is conveyed or encumbered is executed and acknowledged by both husband and wife." (Deering, Civil Code of California, 1941, § 1242.) But in spite of such provision, California statutes providing for alienation of homesteads of insane married persons, upon order of the court, have been upheld. (*Rider v. Regan*, 114 Cal. 667, 46 Pac. 820; *Jones v. Falvella*, 126 Cal. 24, 58 Pac. 311.)

Minnesota has a similar provision of law requiring "the signatures of both husband and wife" to effectuate alienation of the homestead. (2 Mason's Minnesota Statutes, § 8340.) But consent to alienation of the homestead by the guardian of an insane person acting under procedure prescribed for conveyance "of any real estate" is held not to contravene the homestead statute. (*Hayes-Lucas Lumber Co. v. Johnson et al.*, 172 Minn. 504, 215 N. W. 857.)

Courts are properly reluctant to reverse prior decisions in the absence of very cogent reasons for doing so. Within the bounds of reason and justice the doctrine of *stare decisis* rightfully commands respect. But where a wrong decision results in continuing injustices it should not be permitted to stand and particularly so where it cannot be said that any vested rights would be adversely affected by reversal. In the instant case the only "rights" that would be interfered with would be those of adjoining landowners and oil companies who are now permitted to drain away the oil which belongs to appellee and his stricken wife. Furthermore, as it has been pointed out in discussions of the *stare decisis* doctrine, if the court has misconstrued a provision of the constitution there is more reason to set the decision aside than there is to reverse a judicial misconstruction of a statute. In the latter case a comparatively easy remedy may be found through appeal to the legislature. But where the court has wrongly construed a provision of the constitution the chance of relief by constitutional amendment is remote. This principle was clearly stated in a very able opinion written by

the late Justice Henry Mason, of this court, in *Weaver v. Bank*, 76 Kan. 540, 544, 545, 94 Pac. 273, in which a former decision holding the homestead exemption of the constitution was not available to a single person or to a surviving spouse who had no children living with him was reversed. And why should persons deserving relief from a wrong interpretation of the constitution be required to seek the difficult and costly remedy of constitutional amendment? Surely there is nothing unconstitutional in a correction by the court of its own erroneous interpretation.

The rule of *Locke v. Redmond* should be set aside and a sound construction adopted which will effectuate the spirit and purpose of the homestead exemption.

SMITH and ALLEN, JJ., concur in the views expressed in the special opinion by Mr. Justice Hoch.

WEDELL, J. (concurring in the majority opinion): I concur in the view that the district court was without jurisdiction to entertain the action. Only one other court, namely, the probate court, might be empowered to order the execution of the lease in question. Whether the provisions of the probate code authorize the probate court to direct the execution of the instant lease is not an issue now presented or decided. Under these circumstances, I prefer to express no opinion on the constitutional question in the instant appeal.

HARVEY, J. (concurring): I concur in the court's decision and would write nothing more if it were not for the separate opinion of Mr. Justice Hoch. This appears to be based upon the view that the court in its former decisions has failed to interpret or define correctly the word "consent," as used in the section of our constitution (art. 15, § 9) relating to homesteads. Since this question was not one of those ruled upon in the trial court, or argued here in the briefs of counsel, the separate opinion is in the nature of a thesis on a question not pertinent to the opinion. My discussion is from that viewpoint.

The word "consent" has been used uniformly in our former decisions in harmony with the well-settled meaning of the word which has prevailed for centuries. A brief research discloses the following definitions of the word "consent:"

Century Dictionary: *"In law,* intelligent concurrence in the adoption of a contract or an agreement of such a nature as to bind the

party consenting; agreement upon the same thing in the same sense. Consent of parties is implied in all contracts; hence, persons legally incapable of giving consent, as idiots, etc., cannot be parties to a contract. . . . Consent is null where it proceeds on essential mistake of fact, or where obtained by fraud or by force and fear."

Encyclopedia Americana, Vol. 7, p. 545: *"In law,* a free and deliberate act of a rational being."

Oxford English Dictionary: *"Con*-together, + *sentire,* to feel, think, judge, etc. The sense, 'consent to a thing being done,' was a subsequent development, but occurs in the 12th c. in Fr. and is app. the earliest-recorded in Eng. . . . Voluntarily to accede to or acquiesce in what another proposes or desires."

Webster's New International Dictionary: *"Law.* Capable, deliberate, and voluntary assent or agreement to, or concurrence in, some act or purpose, implying physical and mental power and free action."

Bouvier's Law Dictionary: "(Lat. *con,* with, together, *sentire,* to feel). A concurrence of wills. . . . Consent supposes a physical power to act, a moral power of acting, and a serious, determined, and free use of these powers."

15 C. J. S., 979, 980, defines "consent" in various phrases as taken from the authorities, among others: "An act of reason accompanied with deliberation. . . . Capable, deliberate, and voluntary agreement or concurrence in some act or purpose; intelligent concurrence . . . of such a nature as to bind the party consenting, the mind weighing, as in a balance, the good and evil on both sides. . . . At law the term involves approbation and submission, but it cannot be the subject of compulsion. . : . Legally it means a voluntary agreement by a person in the possession and exercise of sufficient mentality to make an intelligent choice. . . . An act unclouded by fraud, duress, or sometimes even mistake. . . . A degree of superiority amounting, at least, to a power of preventing . . . an agreement, or an agreement to, that which, but for the consent, could not exist, and which the party consenting has a right to forbid. . . ."

Many authorities are cited in support of these various definitions. See, also, the cases collected in 8 Words and Phrases, permanent edition, pp. 616, 628. These definitions seem to be of uniform application. I find no reason to say the framers of our constitution did not understand the meaning of the word when they framed the sec-

tion in question. In all of our opinions cited in the separate opinion of Mr. Justice Hoch the court has used the word in harmony with the above definitions, as it did also in *Morris v. Ward,* 5 Kan. 239; *Dollman v. Harris,* 5 Kan. 597; *Anderson v. Anderson,* 9 Kan. 112, 116; *Helm v. Helm,* 11 Kan. 19; *Ayres v. Probasco,* 14 Kan. 175, 190, and in many other of our cases not cited in the separate opinion.

In view of these early decisions, which laid the foundation for the construction of the homestead provision of our constitution, it is hardly accurate to speak of *Locke v. Redmond,* 6 Kan. App. 76, 49 Pac. 670, affirmed by the supreme court, 59 Kan. 773, *per curiam* opinion, 52 Pac. 97, decided twenty to twenty-five years later, as being "the parent case." However, it and others of our cases cited construed the word "consent" in harmony with the definitions hereinbefore set out.

It is said in the separate opinion: "But this court has approved division of property of husband and wife in which a homestead interest was taken away from one spouse and given to the other even though no divorce was granted," citing *Osman v. Osman,* 86 Kan. 519, 520, 121 Pac. 327, and *Wulf v. Fitzpatrick,* 124 Kan. 642, 643, 644, 261 Pac. 838. It should be sufficient to say that no homestead question was presented to or decided by this court in either of those cases. In the Osman case the wife sued for alimony, in which grounds for divorce were alleged and proved, and the court set off to the wife certain property, "leaving to the defendant four quarter sections of land, including the homestead." The wife, who had not been given the homestead, made no complaint of the decree. The husband appealed and earnestly contended "that the judgment, so far as it awards specific property to the wife, is void for lack of power under the statute to do so." This contention was considered and denied. In the Wulf case the wife previously had brought suit for divorce in which, for good cause shown, a divorce was not granted, but a division of the property was made in which certain property, a part of which had been the homestead of the parties, was set off to the wife. Thereafter the husband and wife lived separate and apart from each other. She died, leaving a will, to which he had not consented, and giving all the property to others. His contention was that under G. S. 1935, 22-238, relating to wills of married persons, he was entitled to one-half of the property, and that was the question presented to this court and determined. Our con-

stitution (art. 2, § 18) reads: "All power to grant divorce is vested in the district courts, subject to regulation by law." This is as much a part of our constitution as is article 15, section 9. In *Brandon v. Brandon,* 14 Kan. 342 (1875), judgment had been rendered in favor of the husband for a divorce on account of the fault of his wife, but the court in its decree gave defendant the homestead and the custody of the children. The plaintiff appealed and contended that this violated his right under article 15, section 9, of our constitution. The court held:

"Upon granting a divorce, whether on account of the fault of the wife or the husband, the court has power to award to her the possession of the homestead." (Syl. ¶ 1.)

In the opinion the court cited the statute with reference to the authority of the district court in divorce cases and said:

"The assignment of the homestead to the wife is within the terms of this power. And if it be said that the protection of the constitution is placed around a homestead, it may also be said that the power to grant divorces is also by the constitution expressly given to the district courts, Const., art. 2, § 18. And the constitutional grant of power to divorce, is broad enough to include the power to determine the subordinate and dependent questions of the family property, and the care and custody of the children." (p. 346.)

We are cited to no case, and our own research discloses none, where it has been held the consent of a party, required by a statute or constitutional provision, can be enforced by a court decree. Indeed, there are decisions to the contrary. (See *State, ex rel., v. Public Service Comm.,* 270 Mo. 429, 192 S. W. 958.)

Other legal inaccuracies in the separate opinion might be pointed out, but I shall not take time to do so.

The views of the writer of the separate opinion may be prompted by the thought that plaintiff and his family will be denied some financial gains if someone is not authorized to consent to the lease in question on behalf of the insane spouse. The *value* of the homestead, or whether it is used by its occupants so as to get the greatest financial returns, are not problems dealt with in the homestead provision of our constitution. The primary purpose of the homestead provision was to provide a home for the family, secure from general creditors. (*Morris v. Ward,* 5 Kan. 239, 244; *Monroe v. May,* 9 Kan. 466, 476; *LaRue v. Gilbert,* 18 Kan. 220, 222.) If it is to be amended in those respects, such amendments should be made in the manner provided in the constitution for its amendment and not

by a decree of court. While it is likely our people would be reluctant to amend our constitutional provision relating to homesteads, if the amendment were so framed as to preserve security against general creditors but to enable a court, under conditions carefully specified, to authorize the guardian of an insane spouse to join with the other spouse in refinancing an encumbrance on a homestead, or executing an oil, gas, or other mineral lease thereon, I see no reason why the legislature should not submit it and the people approve it. I would be glad to render such aid as I could in the formation of such an amendment and in having it submitted to the people and adopted.